THE STATE OF KANSAS, ex rel. JOHN S. DAWSON, as Attorney-general, etc., *Plaintiff*, v. CHARLES H. SESSIONS, as Secretary of State, etc., *Defendant.*

No. 18,170.

### SYLLABUS BY THE COURT.

STATE CONSTITUTION—*Submission of Amendments—Mandatory.* The provision of the constitution that a proposed amendment, if approved by both branches of the legislature, shall be voted upon at the next general election, is mandatory, and if such a proposition is not submitted at that election the secretary of state has no authority to provide for its submission at any later time.

Original proceeding in mandamus. Opinion filed June 8, 1912. Writ denied.

*John S. Dawson,* attorney-general, for the plaintiff.
*Charles H. Sessions,* for the defendant.

The opinion of the court was delivered by

MASON, J.: Each house of the legislature of 1903 was understood to have voted in favor of a resolution for the submission to a popular vote, at the general election in 1904, of a proposal to amend the constitution so as in effect to allow the state, in some circumstances, to obtain a change of venue in criminal cases. The attorney-general believed that the legislative records did not show that precisely the same resolution had been adopted by both bodies, and therefore gave his opinion that the proposition ought not to be submitted to the people. In conformity with this view no such submission was had. In order to settle the question whether the proposed amendment may still be voted upon, the attorney-general now brings mandamus against the secretary of state, asking that he be required to provide for placing it upon the official ballot at the coming election.

It will not be necessary to consider whether the pro-

32—87 KAN.

posal ought to have been submitted in 1904.. For present purposes we will assume, without deciding, that it should have been. The constitution provides that where two-thirds of the members of each house concur in a proposition for its amendment, "the secretary of state shall cause the same to be published in at least one newspaper in each county of the state where a newspaper is published, for three months preceding the next election for representatives, at which time the same shall be submitted to the electors for their approval or rejection." (Const. art. 14, § 1.) The resolution in question in express terms provided for the submission of the question at the general election in 1904. The plaintiff suggests that the provision that a proposed amendment shall be submitted at the election next to be held is directory rather than mandatory. Judge Cooley emphasized, in language which has often been quoted, the reluctance of courts to hold a constitutional provision directory, even where the same language, if found in a statute, would be so treated. Of the rule of statutory construction he said:

"Those directions which are not of the essence of the thing to be done, but which are given with a view merely to the proper, orderly, and prompt conduct of the business, and by a failure to obey which the rights of those interested will not be prejudiced, are not commonly to be regarded as mandatory; and if the act is performed, but not in the time or in the precise mode indicated, it may still be sufficient, if that which is done accomplishes the substantial purpose of the statute." (Cooley's Const. Lim., 7th ed., p. 113.)

In contrast to this he said with regard to the interpretation of a constitutional provision:

"But the courts tread upon very dangerous ground when they venture to apply the rules which distinguish directory and mandatory statutes to the provisions of a constitution. Constitutions do not usually undertake to prescribe mere rules of proceeding, except when such rules are looked upon as essential to the thing to be done; and they must then be regarded in the light

of limitations upon the power to be exercised. It is the province of an instrument of this solemn and permanent character to establish those fundamental maxims, and fix those unvarying rules by which all departments of the government must at all times shape their conduct; and if it descends to prescribing mere rules of order in unessential matters, it is lowering the proper dignity of such an instrument, and unsurping the proper province of ordinary legislation. We are not therefore to expect to find in a constitution provisions which the people, in adopting it, have not regarded as of high importance, and worthy to be embraced in an instrument which, for a time at least, is to control alike the government and the governed, and to form a standard by which is to be measured the power which can be· exercised as well by the delegate as by the sovereign people themselves. If directions are given respecting the times or modes of proceeding in which a power should be exercised, there is at least a strong presumption that the people designed it should be exercised in that time and mode only; and we impute to the people a want of due appreciation of the purpose and proper province of such an instrument, when we infer that such directions are given to any other end. Especially when, as has been already said, it is but fair to presume that the people in their constitution have expressed themselves in careful and measured terms, corresponding with the immense importance of the powers delegated, and with a view to leave as little as possible to implication." (Cooley's Const. Lim., 7th ed., p. 114.)

It may well be that under some circumstances, where the constitution prescribes when an act is to be done, the failure of an official to do it at the appointed time will not relieve him from its subsequent performance. Where the effect of the act will be substantially the same if done later—when its benefits to the public will thereby be secured—the rule may be· the same as though only a statute were involved. We do not regard the present case as coming within that class. The question of policy whether a particular proposal to amend the constitution should be submitted to a vote in 1904 is not necessarily the same as whether the

proposal should be submitted in 1906 or in 1912. The conditions that influence the action of the legislature in ordering a question to be submitted at a particular election may have materially changed before the time arrives for another election. The courts can not assume to determine whether any such change has in fact taken place. A legislator may favor the submission of a question in a presidential year, when a full vote may be looked for, which he would be unwilling to have decided at any other time. He may prefer to submit an amendment on one subject at a time when some other particular subject is not under consideration, or when no other amendment is to be submitted. In a given case other legislation or other amendments may have removed the occasion for a proposal which for any reason was not submitted at the proper time.

A special reason, of a similar nature, we regard as conclusive of the matter. The constitution provides that "not more than three propositions to amend shall be submitted at the same election." (Art. 14, § 1.) This restriction is unquestionably imperative. Its reasons are obvious. The framers of the constitution evidently believed that the submission of a larger number of amendments would unduly tend to confusion, and to embarrass an accurate indication of public opinion upon each. Under no circumstances may more than three proposals for constitutional amendments be submitted together. If the failure to submit at the election of 1904 the amendment proposed in 1903 did not in effect annul the action of the legislature in proposing it, then in virtue of that action it was the duty of the secretary of state to place it on the ballot at the election of 1906, thus filling one of the three places available for such purpose, and limiting to two the number of amendments which the legislature of 1905 might propose. That body necessarily knew of the concurrent resolution passed at the previous session, and that it had not been given effect by a submission

to popular vote. Instead of allowing room upon the ballot at the 1906 election for the proposition omitted at the election of 1904, it submitted three new amendments of its own. If at the conclusion of that session the question had arisen whether the secretary of state should place upon the ballot for the next election the amendment proposed in 1903 in lieu of one of those (presumably the last to be adopted) proposed in 1905, it would have been substantially the same as that by which we are now confronted. Either an amendment proposed by the legislature holds its place until it is actually submitted to a vote, or else each legislature is empowered under the constitution to say just what amendments (not more than three) shall be submitted, or whether any shall. We have no hesitation in accepting the latter alternative. If the legislature of 1905 had preferred to submit a proposed amendment designed to cure the evil against which that of 1903 was directed, but by a different method, its right to do so would be beyond serious question. And it seems equally free from doubt that it could not be necessary to submit at the same time two proposals of the same general character. The right to determine what form a proposed amendment on a particular subject shall take implies the right to reject a proposal submitted at a former session, and this implies the right to control absolutely the matter of amendments to be submitted at the ensuing election.

In Oregon the constitution required a proposed constitutional amendment which had been approved by one legislature to be acted upon by the next, and if approved by it, to be submitted by it to a vote of the people. No additional amendment could be proposed while those submitted by one legislature were awaiting the action of another, or of the electors. Several amendments were proposed by the legislature of 1893, and agreed to by that of 1895. The legislature of 1895, however, failed to provide for their submission to the

people. The legislature of 1899 undertook to do so, passing an act for that purpose, and causing a vote to be taken. An amendment known as the "Initiative and Referendum Amendment" was proposed by the legislature of 1899, agreed to by that of 1901, and adopted by popular vote in 1902. Its validity was challenged on the ground that it was proposed while other amendments, duly proposed and agreed to by two consecutive legislatures, were awaiting the action of the electors. The supreme court of Oregon held that when the legislature of 1895 failed to provide for the submission to, the people of the amendments agreed to by it on the proposal of the preceding legislature, the steps taken in that connection were to be regarded as annulled. (*Kadderly v. Portland,* 44 Ore. 118, 74 Pac. 710, 75 Pac. 222.) In the opinion it was said:

"The question then, is, were the amendments proposed by the legislative assemblies of 1893 and 1895 awaiting the action of a legislative assembly or the electors in 1899, when the initiative and referendum amendment was proposed? If so, the latter is invalid because the legislature did not have power to propose it. If, however, the previous amendments had lapsed because of the failure of the legislature of 1895 to submit them to the people, the initiative and referendum amendment was legally proposed, and is valid. . . . A legislature, in proposing and agreeing to amendments and submitting them to the people, is acting under a limited authority, and its powers must be strictly construed. It may propose and submit amendments in the manner provided by the constitution, and in no other way. In doing so, it does not exercise ordinary legislative powers, but rather acts as the agent of the people in the discharge of a ministerial duty, deriving its authority alone from the provisions of the constitution regulating its own amendment. It must comply strictly with all the requirements thereof, and, when the constitution provides that an amendment, after being adopted by the second legislative assembly, shall then be submitted to the electors and published without delay, it seems to us to mean that it must be done by the legislative assembly last adopting it.

The State, *ex rel.*, v. Sessions.

. . . The intent is that the several steps required in proposing and adopting amendments shall follow each other in natural sequence and without delay. . . . The first section is intended to secure dispatch in the adoption of a proposed amendment by the two legislative assemblies, and its ratification or rejection by the people while the matter shall be fresh in the minds of all concerned. . . . It is said that the language ·. . . providing for the submission of a proposed amendment to the electors after it has been agreed to by two successive legislative assemblies, is not mandatory, and since it does not make it the exclusive duty of the second legislature agreeing to the amendment to submit it to the electors, it may be submitted by any subsequent legislative assembly. . . . It is but right and proper . . . that the procedure provided for so important a matter as its own amendment shall be regarded as mandatory, and a limitation upon the exercise of the power. We are . accordingly of the opinion that when an amendment to the constitution shall be agreed to by two legislative assemblies, it must be submitted to the electors by the one last agreeing to it, and a failure in this regard will be fatal to the amendment." (pp. 138-142.)

It is said that it ought not to be possible for the attorney-general and the secretary of state, acting upon an erroneous view of the law, to prevent a popular vote upon a constitutional amendment which has been regularly proposed by the legislature. This is true. But it is also true that the attorney-general and secretary of state ought not to be able (and upon seasonable challenge would not be able) to prevent such a vote at the very election at which the constitution expressly says that it shall be held. If, however, for any reason such a vote is not had at the proper time, the remedy lies with the legislature, which can provide for the submission of the question at a later time, if it regards such course as expedient. If the subsequent legislature thinks that the occasion for the amendment has passed, or that the result desired can be better obtained in

another way, or that for any reason the particular proposal ought not to be voted upon, its judgment in the matter is controlling.

The writ is denied.