No. 33,459

ROLLA W. COLEMAN, W. A. BARRON, CLAUDE C. BRADNEY, J. B. CARTER, WILFRID CAVANESS, KIRKE W. DALE, JESSE C. DENIOUS, BENJAMIN F. ENDRES, EWING HERBERT, W. E. IRELAND, WALTER F. JONES, WALTER E. KEEF, FRED R. NUZMAN, ERNST F. PIHLBLAD, C. W. SCHMIDT, THALE P. SKOVGARD, HARRY M. TOMPKINS, RAY C. TRIPP, ROBERT J. TYSON, N. B. WALL, RAIMON C. WALTERS, GEORGE W. PLUMMER, FRANK C. POMEROY and A. W. RELIHAN, *Plaintiffs*, v. CLARENCE W. MILLER, as Secretary of the Senate, WILLIAM M. LINDSAY, as Lieutenant Governor and President ex officio of the Senate, H. S. BUZICK, JR., as Speaker of the House of Representatives, W. T. BISHOP, as Chief Clerk of the House of Representatives, and FRANK J. RYAN, as Secretary of State; and THE STATE OF KANSAS, *Defendants*.

(71 P. 2d 518)

Opinion filed September 16, 1937.

*Rolla W. Coleman*, of Olathe, *Robert Stone, James A. McClure, Robert L. Webb, Beryl R. Johnson* and *Ralph W. Oman*, all of Topeka, for the plaintiffs.

*E. R. Sloan,* of Topeka, for William M. Lindsay, lieutenant governor.

*Clarence V. Beck,* attorney general, *Payne H. Ratner,* of Parsons, *Wilford Riegle,* of Emporia, and *George Templar,* of Arkansas City, for Frank J. Ryan, secretary of state.

*Harry Fisher, J. S. Parker, C. V. Beck,* all of Topeka, for H. S. Buzick, speaker of the house, and W. T. Bishop, chief clerk.

The opinion of the court was delivered by

ALLEN, J.: This is an original proceeding in mandamus brought by twenty-one members of the state senate and three members of the house of representatives to compel Clarence W. Miller, secretary of the state senate, to erase an endorsement on senate concurrent resolution No. 3 (generally known as the child-labor amendment resolution) to the effect that the same was adopted by the senate, and to compel him to endorse thereon the words "was not passed."

There is no dispute as to the facts. On June 2, 1924, the sixty-eighth congress of the United States proposed the following amendment to the constitution of the United States:

"SECTION 1. The congress shall have power to limit, regulate, and prohibit the labor of persons under eighteen years of age.

"SECTION 2. The power of the several states is unimpaired by this article except that the operation of state laws shall be suspended to the extent necessary to give effect to legislation enacted by the congress."

On January 13, 1937, a resolution known as "senate concurrent resolution No. 3" was introduced into the state senate. This resolution, after the preamble setting forth the joint resolution of congress in proposing an amendment to the constitution of the United States, commonly known as the child-labor amendment, provided:

"*Be it resolved by the senate of the state of Kansas, the house of representatives concurring therein,* That the foregoing and above-cited amendment to the constitution of the United States be, and the same is hereby ratified by said legislature of the state of Kansas as a part of, and amendment to, the constitution of the United States."

On February 15, 1937, this resolution came up for consideration in the senate, and upon roll call twenty senators voted against the adoption and twenty senators voted in favor of the adoption of the resolution. Thereupon W. M. Lindsay, the lieutenant governor of the state, the presiding officer, over the protest of one of the senators, cast his vote in favor of the adoption of the resolution.

As stated, this proceeding in mandamus was brought to compel the secretary of the senate to erase the endorsement on the resolution

that the same was passed, and to make an endorsement thereon that it had not passed.

An alternative writ was allowed and answers filed by all the defendants except the state of Kansas.

At the threshold we are confronted with the question raised by the defendants as to the right of the plaintiffs to maintain this action. It appears that on March 30, 1937, the state senate adopted a resolution directing the attorney general to appear for the state of Kansas in this action. It further appears that on April 3, 1937, on application of the attorney general, an order was entered making the state of Kansas a party defendant. The state being a party to the proceedings, we think the right of the parties to maintain the action is beyond question. (G. S. 1935, 75-702; *State, ex rel., v. Public Service Comm.,* 135 Kan. 491, 11 P. 2d 999.)

Plaintiffs contend: First, the amendment was not ratified by the senate because the lieutenant governor was not a member of the senate and had no right to vote and that the resolution did not receive a vote of a majority of the members of the senate and was lost; second, when the legislature, on January 30, 1925, adopted a resolution to reject the amendment and filed notification thereof with the secretary of state, it exhausted its power with reference to the proposed amendment.

Did the lieutenant governor have the right to cast the deciding vote on senate concurrent resolution No. 3 when the senate was equally divided? In the solution of this question we first look to the constitution of the United States.

Article 5 of the constitution of the United States provides:

"The congress, whenever two thirds of both houses shall deem it necessary, shall propose amendments to this constitution, or, on the application of the legislatures of two thirds of the several states, shall call a convention for proposing amendments, which, in either case, shall be valid to all intents and purposes, as part of this constitution, when ratified by the legislatures of three fourths of the several states, or by conventions in three fourths thereof, as the one or the other mode of ratification may be proposed by the congress; *provided,* That no amendment which may be made prior to the year one thousand eight hundred and eight shall in any manner affect the first and fourth clauses in the ninth section of the first article; and that no state, without its consent, shall be deprived of its equal suffrage in the senate."

It is settled beyond controversy that the function of a state legislature in ratifying a proposed amendment to the constitution of the United States, like the function of congress in proposing an amend-

ment, is a federal function derived from the federal constitution; and it transcends any limitation sought to be imposed by the people of a state. The power to legislate in the enactment of the laws of a state is derived from the people of the state, but the power to ratify a proposed amendment to the federal constitution has its source in that instrument. The act of ratification by the state derives its authority from the federal constitution, to which the state and its people alike have assented. (*Leser v. Garnett*, 258 U. S. 130, 42 S. Ct. 217, 66 L. Ed. 505; *Hawke v. Smith*, 253 U. S. 221, 40 S. Ct. 495, 64 L. Ed. 871, 10 A. L. R. 1504; *Rhode Island v. Palmer*, 253 U. S. 350, 40 S. Ct. 486, 64 L. Ed. 946.)

If the legislature, in ratifying a proposed amendment, is performing a federal function, it would seem to follow that ratification is not an act of legislation in the proper sense of that term. It has been so held. In *Hawke v. Smith*, supra, it was said: "Ratification by a state of a constitutional amendment is not an act of legislation within the proper sense of the word. It is but the expression of the assent of the state to a proposed amendment." (p. 229.)

The function of the legislature being merely to register the assent or approbation of the state to such proposed amendment, in what manner must such assent be manifested? As the legislature of Kansas is a parliamentary body, we must look to the law by which proceedings in that body are governed.

Under section 2 of article 2 of the constitution of Kansas, and G. S. 1935, 4-101, the senate shall consist of forty members, and the house of representatives of one hundred and twenty-five members. (*State, ex rel., v. Francis, Treas.,* 26 Kan. 724.) As it is conceded that senate concurrent resolution No. 3 duly passed the house, our attention must be directed to the action in the senate.

Under the constitution of Kansas (sec. 1, art. 1) the lieutenant governor is a member of the executive department of the state.

Parliamentary action in the senate is governed by two provisions of the constitution. These provisions are:

"The lieutenant governor shall be president of the senate, and shall vote only when the senate is equally divided . . ." (Sec. 12, art. 1.)

"A majority of all the members elected to each house, voting in the affirmative, shall be necessary to pass any bill or joint resolution." (Sec. 13, art. 2.)

It is argued on behalf of the plaintiffs that senate concurrent resolution No. 3 did not receive a vote of a majority of the members of the senate, that the lieutenant governor is not a member of the sen-

ate, hence the resolution did not pass. This view finds a conflict in the two sections, and by placing emphasis on section 13 of article 2, virtually expunges section 12 of article 1 from the constitution.

On the other hand, defendants contend that the lieutenant governor is entitled to vote as a member of the senate on the final passage of bills and joint resolutions. As he was not elected as a member of the senate, this theory writes with invisible ink an amendment to section 13 of article 2, and ignores section 1 of article 1, which specifies that the lieutenant governor is a member of the executive department of the state.

It is evident, therefore, that both plaintiffs and defendants in this controversy find an irreconcilable conflict in the two provisions of the state constitution.

In 1 Cooley's Constitutional Limitations, 8th ed., p. 128, the rule of construction is stated as follows:

"The rule applicable here is that *effect is to be given, if possible, to the whole instrument,* and to every section and clause. If different portions seem to conflict, the courts must harmonize them, if practicable, and must lean in favor of a construction which will render every word operative, rather than one which may make some words idle and nugatory.

"This rule is applicable with special force to written constitutions, in which the people will be presumed to have expressed themselves in careful and measured terms, corresponding with the immense importance of the powers delegated, leaving as little as possible to implication. It is scarcely conceivable that a case can arise where a court would be justified in declaring any portion of a written constitution nugatory because of ambiguity. One part may qualify another so as to restrict its operation, or apply it otherwise than the natural construction would require if it stood by itself; but one part is not to be allowed to defeat another, if by any reasonable construction the two can be made to stand together. Every provision should be construed, where possible, to give effect to every other provision."

Applying these rules of construction, we think the two provisions of the constitution may be harmonized, hence it is not necessary to make a choice between undesirable alternatives. We think the lieutenant governor had a right to vote on the concurrent resolution, for the simple reason that *the vote was not on a bill or joint resolution,* that is, it was not on an act of legislation having the force of law. The vote was merely on a measure expressing assent to the proposed amendment.

Under section 12 of article 1, the lieutenant governor "shall vote only when the senate is equally divided." He may vote, then, in some cases. When? Obviously in all cases of equal division of the

senate, except when his right to vote is expressly denied. By sec-tion 13 of article 2, a majority of all members elected to the senate, voting in the affirmative, is necessary to pass any bill or joint reso-lution. The lieutenant governor was not elected to the senate. The constitution gives him the right to vote when the senate is equally divided, but denies this right in two cases—when the equal division is on a bill or a joint resolution.

The fundamental fallacy in the argument presented on behalf of plaintiffs is in the unwarranted assumption that because the lieu-tenant governor cannot vote on a bill or joint resolution, he is denied the right to vote in all cases. In effect, plaintiffs insist that the legislature in acting on the resolution for ratification of the pro-posed amendment to the federal constitution was engaged in an act of legislation having the force of law.

Article 5 of the constitution of the United States provides that congress, when two thirds of both houses deem it necessary, shall propose amendments to the constitution which, when ratified by the legislatures of three fourths of the states, shall become a part of the constitution. It is not necessary that such proposed amendment be approved by the president, nor that the act of ratification be ap-proved by the governor of a state. Ratification is not an act of legislation; it is merely an expression of the assent of the state to the proposed amendment.

As stated above, the real question for our determination is how that assent may be manifested by the legislature. The vehicle used by the legislature was a concurrent resolution. While concurrent resolutions are not mentioned in the constitution, the constitution does use the expression "bill or joint resolution." In legislative practice a distinction is made between "joint resolutions" and "con-current resolutions." Senate rule No. 48 reads as follows:

"Resolutions shall be of the following classes: (1) senate resolutions, (2) senate concurrent resolutions, and (3) senate joint resolutions. In acting on them, the senate shall observe the following procedure:

"1. Senate resolutions shall be in writing, shall be read and shall lie over one day; they shall not be printed unless ordered by the senate. There shall be no roll call unless ordered.

"2. Senate concurrent resolutions shall be in writing, shall be read, and shall lie over one day. All senate concurrent resolutions shall be printed, and shall require a roll call on motion to adopt. Propositions to amend the constitution shall be submitted by concurrent resolutions, to conform to section 1, article 14, of the constitution: *Provided*, That all concurrent resolutions amending the constitution shall be referred to the proper committee.

"3. Senate joint resolutions shall follow the same procedure as bills, shall be read a first, second and third time, and shall take the regular course of bills on the calendar, and shall when passed on roll call be signed by the governor."

In Legislative Procedure in Kansas, by Guild and Snider, pp. 77-80, it is said:

"Concurrent resolutions are used to express the will or sentiment of both houses of the legislature, and therefore must be acted upon by both houses. There has been considerable confusion in Kansas and in many other states concerning the distinction between concurrent and joint resolutions, and in Kansas the practice is far from standardized. A study of precedents, however, shows that concurrent resolutions are always used in two classes of cases. The first general group concerns the mere expression of an opinion or sentiment by the legislature. Resolutions memorializing congress, relating to the death of a public man, or expressing an opinion on any subject in contrast to passing a law thereon are regularly in the form of concurrent resolutions. In the second group, definite action is taken, binding, however, solely upon the legislature itself and its officers, and not affecting directly the rights of any persons not members of the legislature. Illustrations of such action are: Providing for a joint meeting of the two houses; the appointment of joint committees; agreeing upon final adjournment or setting a date for the introduction or consideration of bills; creating a commission of legislators to investigate public offices. In both of the above groups the general practice in Kansas appears to be to act by concurrent resolutions."

. . . . . . . . . . . . . . .

"A joint resolution pertains to business between the two branches of the legislature and must be acted upon by both houses. A joint resolution has the same binding effect as a law. It is, however, used to accomplish a temporary purpose, and its force is at an end when that purpose has been accomplished. Hence it is now the form prescribed by the rules for appropriations."

. . . . . . . . . . . . . .

"Joint resolutions take the same course as bills, requiring three readings, roll call upon final passage, passage by a constitutional majority of both houses, enrollment and signature by the governor."

The constitution (sec. 20, art. 2) provides that no law shall be enacted except by bill. The structural part of a bill consists of the title, the enacting clause and the body or subject matter. Bills and joint resolutions must be signed by the governor. (Const., sec. 14, art. 2.) No bill shall contain more than one subject, which shall be clearly expressed in the title. (Const., sec. 16, art. 2.) The constitution provides for the form of the enacting clause of all laws (sec. 20, art. 2), and that no law of a general nature shall be in force until the same shall be published. (Sec. 19, art. 2.)

Thus, both by the constitution and by legislative practice, bills

and joint resolutions when duly passed and signed by the governor become legislative enactments, with the force of law. If the senate, on the passage of a bill or joint resolution, should be equally divided, the lieutenant governor, under section 13 of article 2, cannot cast the deciding vote. But it is equally clear that if a proposition other than a bill or joint resolution is before the senate, and on the passage of such measure the senate should be equally divided, then, under section 12 of article 1 of the constitution, the lieutenant governor may cast the deciding vote. Otherwise, section 12 of article 1 would be as futile as a "painted ship on a painted sea."

In so holding we are far from intimating that the title of a resolution, whether "joint" or "concurrent," governs its nature. That must be determined by the purpose and object of the resolution. If the measure has the characteristics of a law, if it appears to have been passed by the law-making power within the scope of its authority as such, and to furnish a general rule of action binding upon individuals, it may be classed as an act of legislation. (Jameson on Constitutional Conventions, 4th ed., sec. 547.) Two cases will illustrate this proposition.

In *State, ex rel., v. Knapp*, 102 Kan. 701, 171 Pac. 639, a resolution entitled "house concurrent resolution" was held to be a bill— that as it had all the characteristics of a legislative act it was a bill within the meaning of the constitution. In that case the court said:

"The inference seems clear that a joint resolution which is approved by the governor after its adoption by the legislature thereby becomes a law, although this is not declared in so many words. If a law can be enacted only by a bill, and a joint resolution may become a law, it would seem that a joint resolution must be a bill, or may in some instances be regarded as a bill."

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Whether or not legislation may ordinarily be accomplished by means of adoption of a proposition submitted in the form of a resolution, we conclude that the process used in the case now under consideration amounted to the enactment of a law by bill. While the instrument acted upon by the two houses and the governor described itself as a concurrent resolution, it had every characteristic, in form and treatment, of such a bill as by the combined action of the legislature and the governor becomes a law. It had a title which clearly expressed its subject to be the appropriation of money to pay for the Lincoln statue. It was read on three separate days in each house. It contained a provision declaring that 'this act' should take effect upon its publication. In each house it received the votes of a majority of the members elected, and the result of the roll call was entered in full on the journal. It

was submitted to and approved by the governor, and published in the official state paper and in the statute book. 'Joint resolutions,' which may sometimes become laws, are required by the constitution to be adopted by a majority of the membership in each house (art. 2, § 13), by a recorded vote (art. 2, § 10), as well as to be approved by the governor, and 'acts' of the legislature must take effect àt a prescribed time, and be published (art. 2, § 19) ; but, save for these requirements, no mere resolution needs to have a title, to be read on three separate days, to show when it takes effect, to be adopted by a yea-and-nay vote entered on the journal, to be approved by the governor, or to be published. The treatment given this measure seems to show that it was regarded by the legislature and the governor as a 'bill.' It ought to be given effect as such, unless some insuperable obstacle is interposed. The fact that it is styled a concurrent resolution, rather than a joint resolution or bill, is not in itself especially important. It should be classified by its essential qualities rather than by what it happens to have been called." (p. 704.)

But this construction did not meet the unanimous approval of the court; three members of the court dissented. In the dissenting opinion of Mr. Justice Dawson it was said:

"A house concurrent resolution is not a law. The constitution takes no cognizance of such a resolution and does not define it. A resolution is a declaration of opinion, or the expression of a purpose—nothing more. In the Session Laws of 1917 are concurrent resolutions expressing the compliments of the house and senate to Hon. Charles F. Scott (ch. 339), expressing condolences on the death of Frank Edimer McFarland (ch. 345), requesting the Kansas senators and representatives in congress to vote for woman suffrage (ch. 351), etc. There are twenty-eight pages of concurrent resolutions in the Session Laws of 1913, the subject matter ranging all the way from memorials to the president on the high cost of living (ch. 341), to denunciations of 'log rolling' and 'pork barrel' raids on the national treasury (ch. 340). And the decision in this case raises all that sort of stuff to the dignity of legislation." (p. 708.)

A similar question arose in the case of *Kelley v. Secretary of State*, 149 Mich. 343, 112 N. W. 978. The Michigan constitution provided:

" 'No bill or joint resolution shall become a law without the concurrence of a majority of all the members elected to each house.'"

" 'The lieutenant governor shall, by virtue of his office, be president of the senate. In committee of the whole he may debate all questions; and when there is an equal division he shall give the casting vote.' " (p. 346.)

Upon the passage of a resolution entitled "concurrent resolution" the senate, consisting of thirty-two members, was equally divided. Thereupon the lieutenant governor voted for the resolution and declared it adopted. The court held the title "concurrent resolution" was unimportant—that its nature and purpose showed that it was

intended as a legislative act, and therefore the lieutenant governor could not vote thereon. The court said:

"But the resolution, if effective, is none the less a law. It is a law for the procurement of such information. If effective, it imposes legal duties upon the secretary of state (and, if it did not, relator is not entitled to relief), upon the clerks, sheriffs, and boards of election commissioners of the several counties of the state, and upon all the canvassing boards in the state. It undertakes— and, if effective, it succeeds in that undertaking—to provide a legal election not otherwise provided for, and to surround the same with all the safeguards of law." (p. 346.)

"It is also open to the construction—and this is the construction placed upon it by the attorney general—that the right of the lieutenant governor to give a casting vote is limited to the proceedings in the committee of the whole. *And it is, perhaps, open to the construction that he also has the right to give the casting vote upon the passage of resolutions which do not have the force of law,* if, as relator contends, there are such resolutions." (p. 347.) (Italics inserted.)

"Whether his right to give such casting vote is limited to proceedings in committee of the whole, *or extends to resolutions, if there be such, which do not have the force of law,* is a question which is not before us and which we do not determine." (p. 348.) (Italics inserted.)

But since there is no valid ground for the contention that senate concurrent resolution No. 3, now before us, was intended as an act of legislation with the force of law, neither the Kansas case of *State, ex rel., v. Knapp,* nor the Michigan case of *Kelley v. Secretary of State,* noted above, has any bearing on the question in this controversy. The distinction is not between a joint resolution and a concurrent resolution; the line is drawn between a measure that has the force of law, and a motion or resolution that is not an act of legislation.

Under article 5 of the constitution of the United States the legislature of Kansas had a right to express its assent to the proposed child-labor amendment. The method adopted was senate concurrent resolution No. 3. This was in no sense an act of legislation in the proper sense of that term; it was the mode in which the legislative assent or approbation was manifested. The senate being equally divided, the lieutenant governor was authorized to cast the deciding vote.

The next question to be considered arises out of the action of the legislature on the 30th day of January, 1925, in rejecting the proposed amendment. On that date the legislature adopted a resolution entitled "house concurrent resolution No. 5," which provided:

"That the said proposed amendment to the constitution of the United States of America be and the same is hereby rejected by the legislature of the state of Kansas."

Certified copies of this resolution were duly forwarded to the Secretary of State at Washington, D. C., and to the presiding officer of each house of congress.

Plaintiffs contend that when Kansas adopted this resolution rejecting the proposed child-labor amendment, it completed its action and exhausted its power with reference to the proposed amendment, and pray that this court enter a declaratory judgment declaring the law with respect to the right of the legislature of the state of Kansas to further consider any resolution, having once rejected said amendment.

It is generally agreed by lawyers, statesmen and publicists who have debated this question that a state legislature which has rejected an amendment proposed by congress may later reconsider its action and give its approval, but that a ratification once given cannot be withdrawn.

In Jameson on Constitutional Conventions, 4th edition, sections 576 and 577, a history of the adoption of the 13th and 14th amendments to the federal constitution is given:

"A question of much interest has several times arisen, whether, when a state legislature has once passed upon an amendment to the federal constitution proposed by congress, its action can afterwards be reconsidered by it, or by its successor, and reversed. It may be useful to consider this question in the two cases, 1, where the action of the legislature was negative, rejecting, and 2, where it was affirmative, ratifying, an amendment.

"1. The question in its negative form first arose, in 1865, in New Jersey, in relation to the thirteenth amendment.

"The amendment was rejected by the legislature of that state December 1, 1865, and notice thereof was duly given to the Secretary of State at Washington. That officer published his certificate December 18, 1865, declaring that the amendment had been adopted by the votes of twenty-seven states, and had become a part of the constitution. In this certificate no mention was made of New Jersey. January 23, 1866, the legislature of New Jersey reversed its previous action, and approved the amendment. The same question arose again in North Carolina, South Carolina, and Georgia, in relation to the fourteenth amendment, submitted by congress to the states on the 16th of June, 1866. The legislatures of those states, together with those of five others, Texas, Virginia, Kentucky, Delaware, and Maryland, rejected the amendment. Afterwards, the governments of ten of the rebel states, including the three first named, were, by the act of congress of March 2, 1867, and the acts supplementary thereto, declared to be illegal, and new governments were erected therein under the direction of congress. By the new legislatures of North Carolina and South Carolina, the former on the 4th and the latter on the 9th of July, 1868, resolutions were passed ratifying the fourteenth amendment. These resolutions were certified to the Secretary of State, and the votes of

those states were, in pursuance of a resolution of congress, counted by that officer as valid votes, and the amendment was on the 20th of July, 1868, in a certificate of that date, proclaimed by him to have been duly ratified. The new legislature of Georgia, in like manner, on the 21st of July, 1868, receded from its vote rejecting the amendment, and passed a resolution ratifying it, and that state was included by the Secretary of State amongst the ratifying states in a second certificate, issued July 28, 1868.

"Were the legislatures in receding thus, and ratifying after having once rejected the amendment, acting within the scope of their powers? The subsequent recognition of the votes by congress, and by the Secretary of State, as valid, must, we think, settle this question in the affirmative."

It would seem, then, that a state legislature which has rejected an amendment proposed by congress may later reconsider its action and give its approval. (Willoughby on the Constitution, sec. 329a.)

In a release from the department of state under date of April 20, 1935, attached as an exhibit to plaintiff's petition in this case, giving the status of the child-labor amendment, it appears that in five states, Indiana, Minnesota, New Hampshire, Pennsylvania and Utah, after the proposed amendment had been rejected, each of the states later adopted a resolution of ratification. When these states rejected the amendment, was their power with reference to the proposed amendment exhausted? If so, the subsequent ratification would be void. Is it to be seriously argued that the secretary of state could not count these five states in making up the total number of states necessary to adopt the amendment?

Thus it appears to be an historical fact that many states have rejected proposed amendments, and have later ratified them.

Aside from the historical facts, and the practical construction by the states as to the right to ratify after a former rejection, Judge Jameson argues that upon principle the right is unquestionable. We quote from sections 579, 581 and 584 of his work on Constitutional Conventions:

"But, whether this decision is authority upon the question now considered or not, the right of a state legislature, after a negative vote has once been passed, to recede from it and ratify an amendment, is, we think, upon principle, unquestionable. The language of the constitution is, that amendments proposed by congress, in the mode prescribed, 'shall be valid to all intents and purposes, as part of this constitution, *when ratified by the legislatures of three fourths of the several states,*' etc. By this language is conferred upon the states, by the national constitution, a special power; it is not a power belonging to them originally by virtue of rights reserved or otherwise. When exercised, as contemplated by the constitution, by ratifying, it ceases to be a power, and any attempt to exercise it again must be a nullity. But, until so

exercised, the power undoubtedly, for a reasonable time at least, remains." (§ 579.)

"To the conclusion that rejection forms no barrier in the way of afterwards ratifying an amendment it may be objected that it recognizes power in the states to ratify, but no power to reject a proposed amendment. This objection is specious, but it has no real foundation. To say that a state has no power to reject would be untrue; for it is an historical fact that, in point of form, many states have rejected amendments, and it would be puerile to contend that a right to pass upon a proposition does not involve a right either to reject or to ratify it. The real question here is what, under the constitution, is the consequence of rejection? Does it, or does it not, as to the rejecting state, definitely settle the fate of the amendment? What we insist upon is, that a state has a right at some time to ratify an amendment submitted to it. That is precisely what is asked of it by congress, and it is that which the constitution empowers it to do. The authority charged with inspecting such votes, therefore, cannot refuse to receive one, certainly if offered within a reasonable time, until after a ratifying vote shall have been received. This view of the question was well presented by Governor Bramlette, of Kentucky, to whom the resolutions above mentioned rejecting the thirteenth amendment had been communicated for his approval, in a message to the legislature of that state. Declining to return the same with his dissent, on the ground that the action of the legislature was complete without his approval, but yet expressing his dissatisfaction with them, and his regret that the amendment had not been ratified, he undertook, as requested in the second resolution, to forward them to the President and to the presiding officers of the two houses of congress. In the course of his message he said:

" 'Rejection by the present legislative assembly only remits the question to the people and the succeeding legislature. Rejection no more precludes future ratification than refusal to adopt any other measure would preclude the action of your successors. When ratified by the legislatures of three fourths of the several states, the question will be finally withdrawn, and not before. Until ratified it will remain an open question for the ratification of the legislatures of the several states. When ratified by the legislature of a state, it will be final as to such state; and, when ratified by the legislatures of three fourths of the several states, will be final as to all. Nothing but ratification forecloses the right of action. When ratified all power is expended. Until ratified the right to ratify remains.' " (§ 581.)

On the question whether a state having once ratified an amendment can subsequently reject such ratification, Jameson says:

"Waiving the consideration of principles, however, the question may be regarded as settled by authority, if a resolution of congress upon it is to be taken as decisive. We have seen that when the votes upon the fourteenth amendment were canvassed by the Secretary of State, doubts were entertained by him whether those of New Jersey and Ohio, whose legislatures had first adopted, and then attempted to reject, that amendment, were to be counted as having adopted it. This doubt was settled by congress, which

declared by resolution that they were to be counted among the ratifying states, which was accordingly done." (§ 584.)

From the foregoing and from historical precedents, it is also true that where a state has once ratified an amendment it has no power thereafter to withdraw such ratification. To hold otherwise would make article 5 of the federal constitution read that the amendment should be valid "when ratified by three fourths of the states, each adhering to its vote until three fourths of all the legislatures shall have voted to ratify."

It is clear, then, both on principle and authority, that a proposed amendment once rejected by the legislature of a state may by later action of the same legislature be ratified; and that when a proposed amendment has once been ratified the power to act on the proposed amendment ceases to exist.

We hold that the legislature of Kansas had power to act on senate concurrent resolution No. 3, and that the resolution having duly passed the house of representatives and the senate, the act of ratification of the proposed amendment by the legislature of Kansas was final and complete.

Finally it is urged that the proposed amendment has lost its potency by old age. This question was considered by Judge Jameson in his work on the constitution, and we quote from sections 585 and 586:

"The same consideration will, perhaps, furnish the answer to the second question. The constitution gives to congress the power to submit amendments to the states; that is, either to the state legislatures or to conventions called by the states for this purpose, but there it stops. No power is granted to prescribe conditions as to the time within which the amendments are to be ratified, and hence to do so would be to transcend the power given. The practice of congress in such cases has always conformed to the implied limitations of the constitution. It has contented itself with proposing amendments, to become valid as parts of the constitution, according to the terms of that instrument. It is, therefore, possible, though hardly probable, that an amendment, once proposed, is always open to adoption by the nonacting or nonratifying states.

"The better opinion would seem to be that an alteration of the constitution proposed today has relation to the sentiment and the felt needs of today, and that, if not ratified early while that sentiment may fairly be supposed to exist, it ought to be regarded as waived, and not again to be voted upon, unless a second time proposed by congress. (§ 585.)

"We discuss this question here merely to emphasize the dangers involved in the constitution as it stands, and to show the necessity of legislation to make certain those points upon which doubts may arise in the employment

of the constitutional process for amending the fundamental law of the nation. A constitutional statute of limitation, prescribing the time within which proposed amendments shall be adopted or be treated as waived, ought by all means to be passed." (§ 586.)

In submitting the proposal for the eighteenth amendment, congress interpolated a limitation that it should be inoperative unless ratified "within seven years from the date of the submission hereof." A similar provision as to the time of ratification was contained in the submission of the twentieth and twenty-first amendments.

The power of congress to fix such a limitation was challenged in *Dillon v. Gloss*, 256 U. S. 368, 41 S. Ct. 510, 65 L. Ed. 994. The court held that congress had power to fix the limitation within some reasonable time and that seven years was a reasonable time. This was the decision in the case. The court, *obiter*, said:

"These considerations and the general purport and spirit of the article lead to the conclusion expressed by Judge Jameson 'that an alteration of the constitution proposed today has relation to the sentiment and the felt needs of today, and that, if not ratified early while that sentiment may fairly be supposed to exist, it ought to be regarded as waived, and not again to be voted upon, unless a second time proposed by congress.' That this is the better conclusion becomes even more manifest when what is comprehended in the other view is considered; for, according to it, four amendments proposed long ago—two in 1789, one in 1810 and one in 1861—are still pending and in a situation where their ratification in some of the states many years since by representatives of generations now largely forgotten may be effectively supplemented in enough more states to make three fourths by representatives of the present or some future generation. To that view few would be able to subscribe, and in our opinion it is quite untenable. We conclude that the fair inference or implication from article 5 is that the ratification must be within some reasonable time after the proposal.

"Of the power of congress, keeping within reasonable limits, to fix a definite period for the ratification we entertain no doubt. As a rule the constitution speaks in general terms, leaving the congress to deal with subsidiary matters of detail as the public interests and changing conditions may require; and article 5 is no exception to the rule. Whether a definite period for ratification shall be fixed, so that all may know what it is and speculation on what is a reasonable time may be avoided, is, in our opinion, a matter of detail which congress may determine as an incident of its power to designate the mode of ratification. It is not questioned that seven years, the period fixed in this instance, was reasonable, if power existed to fix a definite time; nor could it well be questioned considering the periods within which prior amendments were ratified." (p. 375.)

It will be observed that the supreme court in its opinion quoted with approval the statement of Jameson that a proposed amendment

"has relation to the sentiment and the felt needs of today, and that, if not ratified early while that sentiment may fairly be supposed to exist, it ought to be regarded as waived."

The struggle over the child-labor problem is a part of the recent history of the United States. The attempt of congress to solve the problem under the commerce clause of the constitution came before the supreme court in 1918 in *Hammer v. Dagenhart*, 247 U. S. 251, 38 S. Ct. 529, 162 L. Ed. 1101. The act was held unconstitutional.

Following its failure to control the evil of child labor under the commerce clause, congress turned to the taxing power. This second act of congress was declared unconstitutional in 1922 in *Bailey v. Drexel Furniture Co.*, 259 U. S. 20, 42 S. Ct. 449, 66 L. Ed. 817. Following these vain attempts to control the problem, congress in 1924 proposed the child-labor amendment.

The history of the agitation over the child-labor question since the proposed amendment is a matter of common knowledge. We have no concern with the wisdom of the proposed amendment, but of necessity must hold that the proposal "has relation to the sentiment and felt needs of today," which seems to be the criterion adopted by the supreme court in *Dillon v. Gloss,* supra. We therefore hold the proposed amendment retains its original vitality, and that the assent of the legislature was legally manifested by the adoption of senate concurrent resolution No. 3. The writ of mandamus is denied.

HUTCHISON, J., dissenting.

SMITH, J. (concurring specially): I concur in the judgment that the writ should be denied, but do not agree altogether with what is said in the opinion as to the reasons therefor, especially with reference to the second paragraph of the syllabus.

The opinion in effect places its conclusion upon a distinction between a joint resolution and a concurrent resolution. The holding is that had this been a joint resolution the lieutenant governor could not have voted on its passage. I can see no reason why this should be true. What is there about a joint resolution that its passage should be expedited, while the passage of a concurrent resolution should be made more difficult? If any distinction should be made it seems to me that as important a step as a change in the federal constitution should be hedged about with more safeguards than a

resolution expressing the opinion of the two houses of the legislature on some public question.

I prefer the view that the president of the senate has the right to vote on any matter that comes before the senate when the senate is equally divided. I believe this position may be maintained by an examination of the language of the constitution.

In the first place, section 13 of article 2 does provide that a majority of all the members elected to each house voting in the affirmative shall be necessary to pass any bill or joint resolution. It is true that the president of the senate is not elected to the senate, that is, he is not elected to it as a senator, but it is hardly correct to say that he is not elected to it at all.

We must consider all the sections of the constitution. Section 1 of article 1 provides for the executive branches of the state and government. Among the officers provided for are the governor and lieutenant governor. Then follow some sections that define the duties and powers of the governor. Then section 11 of article 1 provides that in case of the death, impeachment, resignation, removal or other disability of the governor, the power and duties of the office for the residue of the term or until the disability shall be removed shall devolve upon the president of the senate. It should be noted that this section does not say "lieutenant governor"—it says "president of the senate." The next section is as follows:

"The lieutenant governor shall be president of the senate, and shall vote only when the senate is equally divided. The senate shall choose a president pro tempore, to preside in case of his absence or impeachment, or when he shall hold the office of governor."

The language should be noted carefully. The first statement is that the lieutenant governor "shall be president of the senate." With this provision in the constitution it is plain that when the people elect a lieutenant governor they are electing a president of the senate. Indeed, with a single exception, only one lieutenant governor ever did anything more than act as president of the senate. That was the occasion when Nathaniel Greene succeeded Governor Samuel J. Crawford, who resigned as governor in 1868 to accept a commission as colonel of the 19th Kansas Volunteers to fight Indians on the western frontier of our state.

Let us examine the next statement in the first sentence of this section. It says that the president of the senate shall vote only when the senate is equally divided. The section does not say that

the president of the senate shall not vote on the passage of a bill or a joint resolution, but it says he shall vote only when the senate is evenly divided. A fair inference to be drawn from this language is that he could vote on any matter before the senate when the senate is equally divided.

We thus have a constitution, the various provisions of which it is our duty to construe together. When this is done I have no difficulty in reaching a conclusion that the lieutenant governor is a part of the senate and has the right to vote on any matter that comes before the senate where the senate is equally divided. I do not concur in the language in the opinion wherein it is stated that the action of the senate was not a legislative act. To my mind it was a legislative act of a high degree of importance.