No. 46,358

Earl C. Moore, *Appellant, vs.* Elwill M. Shanahan, Secretary of State, *Appellee.*

(486 P. 2d 506)

Opinion filed June 12, 1971.

*Earl C. Moore,* of Wichita, argued the cause, and *Dan Turner, Ron Baxter,* and *John Wilkinson,* of Topeka, were with him on the brief for appellant.

*Edward G. Collister, Jr.,* assistant attorney general, argued the cause, and *Vern Miller,* attorney general was with him on the brief for appellee.

The opinion of the court was delivered by

Fatzer, J.: This appeal was heard at the March 1971 Session, and on March 11, due to the pressing public questions presented, the court announced its decision affirming in part and reversing in part the judgement of the district court. (*Moore v. Shanahan,* 207 Kan. 1, 486 P. 2d 506.)

At the 1970 Session of the Legislature, three propositions for the amendment of the Kansas Constitution were adopted by two-thirds of the members of the House of Representatives and the Senate, to be submitted to the qualified electors of the state for their approval or rejection at the general election on November 3, 1970.

On October 19, 1970, the plaintiff, Earl C. Moore, a member of

the Bar of Kansas, a taxpayer and qualified elector, and residing in Wichita, commenced this action against Elwill M. Shanahan, Secretary of State for the state of Kansas, to enjoin her from submitting each of the said proposed amendments to the electors of the state. The petition alleged the plaintiff filed the action on his behalf and on behalf of all the electors of the state of Kansas similarly situated, upon the ground the three proposed amendments were ineffective as amendments to the Constitution of Kansas, and would be inoperative if approved by the people; that, as a taxpayer and elector, he was entitled to relief against the unconstitutional submission of said amendments, and the improper expenditure of public funds. The plaintiff specfiically alleged that each proposed amendment was in violation of that part of Section 1, Article 14, which reads:

"When more than one amendment shall be submitted at the same time, they shall be so submitted as to enable the electors to vote on each amendment separately; and not more than three propositions to amend shall be submitted at the same election."

Proposition 1 was proposed by Senate Concurrent Resolution No. 8 (L. 1970, Ch. 189), to amend Section 10, Article 15, by removing the provision forever prohibiting the "open saloon" in Kansas. In view of what is stated hereafter, no further reference to this amendment need be made.

Proposition 2 was proposed by Senate Concurrent Resolution No. 1033 (L. 1970, Ch. 411), to amend Sections 1 and 2, Article 14, relating to constitutional amendment and revision.

Proposition 3 was proposed by House Concurrent Resolution No. 1026 (L. 1970, Ch. 347), to amend Article 1, relating to the executive branch of the state government, and to repeal Article 8, relating to the militia of the state.

The secretary of state having caused the proposed amendments to be published as required by Section 1, Article 14, and also having prepared and distributed to the various county clerks and election commissioners, the form of the ballot for the submission of said proposed amendments to the electors for their approval or rejection, the district court, in accordance with the principle of general application that courts will not enjoin the holding of an election, refrained from issuing a temporary injunction, or the restraining order prayed for. (*Dunn v. Morton County Comm'rs*, 162 Kan. 449, 177 P. 2d 207, Syl. ¶ 3.)

At the general election on November 3, 1970, a majority of the qualified electors voting on proposition 1 rejected it, and a majority of those electors voting on propositions 2 and 3 adopted each proposed amendment, although in so doing, they cast some 120,000 less votes on propositions 2 and 3 than they cast on proposition 1.

On November 6, 1970, the attorney general of Kansas, acting for and on behalf of the secretary of state, filed an answer to the plaintiff's petition. The answer alleged the defendant had no knowledge of plaintiff's residence in Wichita, but "admits that plaintiff is qualified to bring this action." The answer made allegations of the electors' rejection of proposition 1, and that the plaintiff's claim concerning the same was moot. It denied the plaintiff was entitled to any relief requested, and alleged the remaining two proposed amendments, 2 and 3, were constitutional. The prayer was that judgment be entered in favor of the defendant on propositions 2 and 3, and that they be declared to be constitutionally submitted and adopted.

Thereafter, and on November 9, 1970, the plaintiff filed an amended petition in which he incorporated many of the allegations of his original petition, including his right to bring the action, and alleged that proposition 2 contained at least six separate amendments, specifically alleging each separate amendment, upon which an elector had the right to vote on each amendment separately; that the six proposed amendments completely revising Article 14, constituted more than one amendment, and denied the plaintiff and other electors similarly situated the right to vote "yes" or "no" on each amendment separately, and also violated the constitutional prohibition that not more than three propositions to amend shall be submitted at the same election.

The amended petition further alleged that proposed amendment 3 contained at least twelve separate amendments to Article 1, and repealing Article 8, specifically alleging each separate amendment, upon which an elector had the right to vote on each amendment separately; that the twelve proposed amendments completely revising Article 1, and repealing Article 8, constituted more than one amendment, and denied the plaintiff and all other electors similarly situated, the right to vote "yes," or "no," on each amendment separately, and also violated the constitutional prohibition that not more than three amendments be submitted together.

The amended petition contained allegations concerning the State

Board of Canvassers and its duty to canvass the election abstracts, and that the defendant and the members of such Board should be restrained from certifying the abstracts of election on amendments 2 and 3 until the court had opportunity to pass upon their constitutionality. Further reference to those allegations and the restraining order issued thereon, is deemed unnecessary.

On December 3, 1970, the district court heard the case on its merits, and on January 27, 1971, it entered judgment dismissing the plaintiff's action, "because (1) he has no legal standing to bring the action, and (2) plaintiff is not entitled to the relief he seeks since propositions 2 and 3 submitted to the electors on November 3, 1970, are constitutional."

The plaintiff timely perfected this appeal, and this court advanced the case for hearing to the March 1971 Session. The case was heard on its merits March 5, and on March 11, this court made public announcement of its decision. (*Moore v. Shanahan*, supra.)

At the outset, we are met with the plaintiff's contention the district court erred in holding he had no legal standing or capacity to bring the action. The point is well taken. The verified petition alleged the plaintiff was a qualified elector of Wichita and brought the action on his behalf and all other electors of the state of Kansas similarly situated. The defendant's answer made no denial of that allegation, and specifically admitted the plaintiff was qualified to bring the suit. The question was neither raised nor briefed by the parties in the district court, but the court, on its own initiative, injected the issue into the case. Courts have jurisdiction to decide only such issues as are raised by the pleading or defined in the pretrial order, or new issues raised by evidence to which no objection is made. (*Shriver v. Board of County Commissioners*, 189 Kan. 548, 552, 370 P. 2d 124, and cases cited; *McAdam v. Fireman's Fund Insurance Co.*, 203 Kan. 123, 452 P. 2d 851.)

Under K. S. A. 60-209 (*a*), an objection to the legal capacity of the plaintiff to sue may be taken by answer, and the defendant is required to do so by a specific negative avermant, or it will be waived. (*Augusta Oil Co., inc. v. Watson*, 204 Kan. 495, 464 P. 2d 227.) See, also, 1 Vernon's Kansas Statutes Annotated [Fowks, Harvey, Thomas], Code of Civil Procedure, § 60-209 (*a*), p. 31. Moreover, the rule that this court must, on its own motion, dismiss the appeal if it appears the district court was without jurisdiction, is not applicable to the situation here presented. In the case at bar,

the district court confessedly had jurisdiction of the subject matter of injunction and of the parties. The petition presented the question to be determined as an issue, and contained sufficient facts to challenge the court's attention as to its merits. The district court's conclusion did not go to its jurisdiction, but to the legal standing or capacity of the plaintiff to seek relief.

The right to vote in any election is a personal and individual right, to be exercised in a free and unimpaired manner, in accordance with our Constitution and laws. The right is pervasive of other basic civil and political rights, and is the bed-rock of our free political system. Likewise, it is the right of every elector to vote on amendments to our Constitution in accordance with its provisions. This right is a right, not of force, but of sovereignty. It is every elector's portion of sovereign power to vote on questions submitted. Since the right of suffrage is a fundamental matter, any alleged restriction or infringement of that right strikes at the heart of orderly constitutional government, and must be carefully and meticulously scrutinized. In *Harris v. Shanahan,* 192 Kan. 183, 387 P. 2d 771, it was held:

"Under the republican form of government prescribed in the Constitution of Kansas, every citizen and qualified elector is entitled to a vote . . ." (Syl. ¶ 11.)

and in the opinion it was said:

". . . Every citizen and qualified elector in Kansas has an undoubted right to [vote] . . . and has a further right to invoke the power of the courts to protect such constitutional right . . ." (l. c. 207.)

The holding was cited and approved in *Harris v. Shanahan,* 192 Kan. 629, 390 P. 2d 772, and in *Harris v. Anderson,* 194 Kan. 302, 400 P. 2d 25, cert. den. 382 U. S. 894, 15 L. Ed. 2d 150, 86 S. Ct. 185. See, also, *Coleman v. Miller,* 146 Kan. 390, 71 P. 2d 518, affirmed 307 U. S. 433, 83 L. Ed. 1385, 59 S. Ct. 972, where it was held that individual members of the Senate had the right to maintain an action in this court to enforce an alleged impairment of their constitutional rights, where the lieutenant governor cast the deciding vote when the Senate was equally divided, on a concurrent resolution to ratify the so-called child labor amendment to the Constitution of the United States.

We have examined the cases cited by counsel, and have also examined many others, and find that no court has denied the right of an individual elector to bring an action on his behalf of all

other electors of the state similarly situated, attacking a proposed amendment to a state Constitution upon the ground it was submitted in violation of the amendment Article. Under the record presented, we hold the plaintiff had legal standing and capacity to maintain this action, and any matter affecting the validity of the submission of the proposed constitutional amendments to the electors may be investigated and determined.

With respect to the conclusion just announced, we again note this action was commenced prior to the holding of the general elections on November 3, 1970, and that this court announced its decision on the merits of the appeal on March 11, 1971, before any rights had accrued to any citizen, or elections held pursuant to proposition 2, or before reorganization orders were issued by the governor or elections held pursuant to proposition 3, and before any state officer or department of this state had in any way recognized the validity of the amendments under consideration. See *Prohibitory Amendment Cases,* 24 Kan. * 711, 718, 719, 720.

It should here be noted that, notwithstanding the court's approval of proposition 2 amending Sections 1 and 2 of Article 14, as hereafter noted, this case is required to be decided in accordance with the provisions of Article 14 as they existed when the 1970 Legislature submitted propositions 2 and 3 to the electors for their approval or rejection on November 3, 1970. With this admonition, we turn to the legal questions that the House Concurrent Resolutions submitting those propositions violated Section 1 of Article 14, and refer to the rule that whether the constitutional method has been pursued, is purely a judicial question, and no authority is vested in any officer, department of state, or tribunal, other than the courts, to consider and determine that matter. In *Harris v. Shanahan,* 192 Kan. 183, 387 P. 2d 771, it was said:

". . . when legislative action exceeds the boundaries of authority limited by our Constitution, and transgresses a sacred right guaranteed or reserved to a citizen, final decision as to invalidity of such action must rest exclusively with the courts. In the final analysis, this court is the sole arbiter of the question whether an act of the legislature is invalid under the Constitution of Kansas. (*Quality Oil Co. v. du Pont & Co.,* 182 Kan. 488, 493, 322 P. 2d 731.) However delicate that duty may be, we are not at liberty to surrender, or to ignore, or to waive it . . . It is axiomatic that an . . . act of the legislature, is subject to the limitations contained in the Constitution, and where such act exceeds the bounds of authority vested in the legislature and violates the limitations of the Constitution, it is null and void and it is the duty of courts to so declare . . ." (l. c 207.)

We also refer to the rule that the constitutionality of a statute or concurrent resolution is presumed, and that all doubts must be resolved in favor of their validity, and before they may be stricken down, it must appear the infringement of the Constitution is clear beyond substantial doubt. It is the court's duty to uphold the concurrent resolutions, rather than defeat them, and if there is any reasonable way to construe them as constitutionally valid, that should be done. (*State, ex rel., v. Fadely,* 180 Kan. 652, 659, 308 P. 2d 537; *Wall v. Harrison,* 201 Kan. 600, 603, 443 P. 2d 266.)

The Kansas Constitution was adopted in 1859, and is the supreme and paramount law, receiving its force from the express will of the people. It established three separate departments of government and placed upon each of them limitations which experience has shown to be essential to a progressive government. It has worked well in practice, and is a monument of the wisdom and patriotism of its framers. But no product of the human mind is perfect, so the framers prescribed the manner by which the Constitution could be amended or revised, which is clearly defined. Those wise men saw that, in a state where the people were admitted to a direct participation in the government, party passions and interests might likely lead to too much tampering with the Constitution, if effectual checks were not imposed, and, what may be thought otherwise, restriction with respect to amendment and revision was the policy of the constitutions of the states that were selected as models from which to fashion the new Kansas Constitution. (Proceedings and Debates, Wyandotte Constitutional Convention, 1859.)

In any event, it was settled that the only manner in which the Constitutition could be amended or revised, was in accordance with Article 14 which prescribed two methods by which changes may be effected. One, called the legislative method, by which the people adopt propositions for specific amendments that have previously been submitted by two-thirds of the members of each house of the Legislature (Sec. 1), and the other, called the convention method, by which delegates are chosen by the people for the express purpose to "revise, amend or change" one or more articles, or the entire instrument itself (Sec. 2)—followed by a ratification by the people. See, *Staples v. Gilmer,* 183 Va. 613, 33 S. E. 2d 49, 158 A. L. R. 495. The idea of the Kansas people thus restricting themselves was a part of the American system of written constitutions, and was con-

vincing evidence that amongst them liberty and freedom meant, not the giving of rein to passion or to thoughtless impulse, but the considered exercise of power by the people for the general good, and, therefore, always under the restraint of law. Hence, the framers of our Constitution avoided the dangers attending a too frequent change in our fundametntal law, and likewise obviated the danger —to be equally shunned—of making amendments too difficult. No government can expect to be permanent unless it guarantees progress as well as order; nor can it continue to secure order unless it promotes progress. Thus, the Kansas Constitution reconciled the requisites for progress with the requisites for safety and order. (*Prohibitory Amendment Cases,* supra, p. 507; Jameson, Constitutional Conventions, § 528, p. 549.)

Under the legislative method, the power of the Legislature to initiate any change in the Constitution is of greatly less extent than that of calling a constitutional convention, and, being a delegated power, is to be strictly construed under the limitations by which it is conferred. In submitting propositions for specific amendments to the Constitution, the Legislature does not act in the exercise of its ordinary legislative power (Sec. 1, Art. 2), but it possesses and acts in the character and capacity of a convention pursuant to the power delegated to it in Section 1, Article 14, and is *quoad hoc,* a convention expressing the supreme will of the people; it is limited in its power of proposing amendments to the Constitution by the provisions of that section and article, except with respect to such powers as may be, or have been previously delegated by the people to the Constitution of the United States. On this point, in *State, ex rel., v. Sessions* 87 Kan. 497, 124 Pac. 403, this court quoted from *Kadderly v. Portland,* 44 Ore. 118, 74 Pac. 710, 75 Pac. 222, as follows:

"'. . . A legislature, in proposing and agreeing to amendments and submitting them to the people, is acting under a limited authority, and its powers must be strictly construed. It may propose and submit amendments in the manner provided by the constitution, and in no other way. In doing so, it does not exercise ordinary legislative powers, but rather acts as the agent of the people in the discharge of a ministerial duty, deriving its authority alone from the provisions of the constitution regulating its own amendment . . . It is but right and proper . . . that the procedure provided for so important a matter as its own amendment shall be regarded as madatory, and a limitation upon the exercise of the power . . .'" (l. c. 502, 503.)

In *Prohibitory Amendment Cases,* supra, Mr. Justice Brewer,

speaking for this court on the part the Legislature plays when the constitutional requirements have not been obeyed, said:

". . . It lacks the sanction of law, is a disregard of constitutional methods and limitations, and should be taken as a request for a change, rather than as a change itself. But, notwithstanding this, legislative action is simply a determination to submit the question to popular decision. It is in no sense final. No number of legislatures, and no amount of legislative action, can change the fundamental law. This was made by the people, who alone can change it. The action of the legislature in respect to constitutional changes is something like the action of a committee of the legislature in respect to the legislative disposition of a bill. It presents, it recommends, but it does not decide . . ." ( * 711, 712. )

It was evidently thought by the framers of the Constitution that the legislative method would be well adapted to changes which are few, simple, independent, and of comparatively small importance. It seems very clear from the provisions of Section 1 authorizing amendments pursuant to the legislative method, as compared with Section 2 authorizing a call of a convention, that the purpose of the former is different from the latter—in other words, the thing authorized to be done by the first section is a different thing entirely from that authorized to be done by the second section. Thus, the purpose of the legislative method is to bring about amendments which are few, simple, and independent; and on the other hand, the convention method is to revise the entire Constitution, with a view to propose either a new one, or, as the greater includes the less, to amend or change one or more articles. The phraseology used in Section 1 is to propose "amendments" to the Constitution, whereas the phraseology used in Section 2 is to call a convention "whenever . . . the members elected to . . . the legislature shall think it necessary . . . to revise, amend, or change" the Constitution. (Emphasis supplied.) In not a single instance is the word "revise" or any of its derivatives employed with respect to the legislative method—only the word "amendment" is used. It appears evident, therefore, that the legislative method is in sharp contrast with the convention method, which is employed for "revision." To say that the purpose of the two methods is the same, is to say that a part is equal to, or the same as, the whole.

Historical facts of amending the Constitution, and the experience and tradition of the Legislature in submitting amendments to the electors for their approval or rejection, show that nearly 1000 resolutions seeking constitutional changes have been introduced in the Legislature since our admission to the Union. (Your Government,

Bulletin of the Governmental Research Center, University of Kansas, Cape, Volume XXIV, No. 2, October 15, 1968.) From 1861 to and including 1970, the Legislature has submitted 85 propositions to amend the Constitution. Of the 85 submitted, 55 were adopted by the people, and 30 rejected. In almost every instance, each proposition or amendment has been directed to a single, independent, and specific change in one or more sections of an article. A study of each amendment confirms this fact. Several new sections have been added, but all related to a single subject. Being specific and independent and relating directly to the subject sought to be changed, those amendments produced no controversy. This is the principal reason why this court has not previously been called upon to decide the question here presented.

It was not until 1959 that it was ever suggested that an entire article of the Constitution might be submitted as one amendment. This suggestion came about in a report of a commission on constitutional revision. In 1957 the governor appointed a "Governor's Commission on Constitutional Revision," which was later joined by the Legislative Council's Special Committee. In a progress report dated January 30, 1959, the Commission stated, ". . . that, to date, the Commission has not committed itself to a constitutional convention," and concluded that, ". . . an entire article (of the Constitution) can be replaced with another under the present amending process by means of a single amendment . . ." (Your Government, *op. cit., supra.*) No reference was made to any source for the statement, and the Commission cited no law or constitutional authority to support it. The Commission made its final report to the governor in January, 1961. In the same month, the governor appointed a Second Commission on Revision of the Kansas Constitution, and its report was published January, 1963. (Your Government, *op. cit., supra,* No. 9, May 15, 1969.) In January, 1968, the governor, in his annual message to the Legislature, stated there was a need to revise and modernize the Constitution, and that ". . . this legislature should take necessary steps to call a constitutional convention." (Your Government, *op. cit., supra,* No. 2, October 15, 1968.) Instead, the Legislature established the Citizens' Committee on Constitutional Revision (Ch. 265, L. 1968), which made a comprehensive report to the governor and Legislature in February, 1969. The report recommended extensive changes in all of the existing fifteen articles of the Constitution, or their repeal, except

Article 11 which was unchanged. Propositions 2 and 3, hereafter referred to, were included in the report.

How may the Constitution be legally amended under the legislative method? An examination of Section 1, Article 14, discloses that it does not provide specifically for the manner in which amendments to the Constitution may be proposed, except that the same shall be printed in full on the ballot (*State , ex rel., v. Shanahan,* 183 Kan. 464, 327 P. 2d 1042), and,

". . . [w]hen more than one amendment shall be submitted at the same time, they shall be so submitted as to enable the electors to vote on each amendment separately; and not more than three propositions to amend shall be submitted at the same election."

This portion of Section 1 has not previously been interpreted by this court, except in *State, ex rel., v. Sessions,* supra, the last clause of the section was considered, and it was said:

". . . The constitution provides that 'not more than three propositions to amend shall be submitted at the same election.' (Art. 14, § 1.) This restriction is unquestionably imperative. Its reasons are obvious. The framers of the constitution evidently believed that the submission of a larger number of amendments would unduly tend to confusion, and to embarrass an accurate indication of public opinion upon each. Under no circumstances may more than three proposals for constitutional amendments be submitted together . . ." (l. c. 500.)

The present meaning of Section 1, Article 14, is the meaning it bore in 1859 (*Prohibitory Amendment Cases,* supra), and is to be construed in the light of the exigencies and conditions which it was intended to meet and deal with. The word "amendment" implies a specific change or alteration of subject matter within the original lines of the Constitution as will effect an improvement, or better carry out the purpose for which it was framed. (*Livermore v. Waite,* 102 Cal. 113, 36 Pac. 424, 25 L. R. A. 312; *Kelly v. Laing,* 259 Mich. 212, 219, 242 N. W. 891.)

The foregoing quoted provision of Section 1 is mandatory, and requires a submission of proposed amendments in such manner that the electors may vote upon each amendment separately. The provision is a wise one, and is intended to prevent several separate and unrelated subjects from being submitted to the electors in the same amendment, thus forcing them to approve or reject the amendment as a whole. Likewise, it is intended to prevent burdening a meritorious proposition with a vicious one, and also to prevent a vicious proposition from having the support of the meritorious one,

thus giving to the elector the right to have each separate proposition submitted to him in order that he may express his will for or against each separately, without being compelled to accept a proposition to which he is opposed, in order to have adopted a proposition which meets his favor. (*McBee v. Brady*, 15 Idaho 761, 100 Pac. 97.)

Just what is meant by "more than one amendment" which shall be so submitted to enable electors to vote on "each amendment separately," as used in Section 1, is not an easy matter to determine. It was evidently the intention of this provision to require that amendments which are incongruous, or which do not relate to the same subject matter or have the same object and purpose, should be considered as separate amendments. The question of duplicity of an amendment was decided by the Wisconsin Supreme Court in the early case of *The State ex rel. Hudd vs. Timme, Secretary of State*, 54 Wis. 318, 11 N. W. 785, which has been followed by a vast majority of the courts of the country as stating a sound rule. The Wisconsin court held that a proposal to amend separate sections of the legislative article, involving the subject of a change of legislative sessions from annual to biennial sessions, was properly submitted as a single amendment, even though there were provisions therein for increasing compensation, and for necessary changes of tenure and of the time and method of election of the senators and representatives for such biennial sessions. In the opinion it was said:

"We think amendments to the constitution, which the section above quoted requires shall be submitted separately, must be construed to mean amendments which have different objects and purposes in view. *In order to constitute more than one amendment, the propositions submitted must relate to more than one subject, and have at least two distinct and separate purposes not dependent upon or connected with each other.* Tested by this rule, the propositions submitted to the electors contained but one amendment . . ." (l. c. 336.) (Emphasis supplied.)

See, also, *Livermore v. Waite*, supra, and *McFadden v. Jordan*, 32 Cal. 2d 330, 196 P. 2d 787.

In *Kerby v. Luhrs*, 44 Ariz. 208, 36 P. 2d 549, 94 A. L. R. 1502, the supreme court of Arizona cited many authorities, and approved and clarified the test laid down in *Timme*, supra. There, one amendment was submitted which related to the subject of taxation, and provided the method in which copper mines should be taxed; it also provided the manner in which public utility corporations should be assessed and taxed, and further provided that the State Tax Commission

which was previously created by legislative enactment, was created and declared to be a constitutional commission. In the opinion it was said:

"If the different changes contained in the proposed amendment all cover matters necessary to be dealt with in some manner, in order that the Constitution, as amended, shall constitute a consistent and workable whole on the general topic embraced in that part which is amended, and if, logically speaking, they should stand or fall as a whole, then there is but one amendment submitted. But, if any one of the propositions, although not directly contradicting the others, does not refer to such matters, or if it is not such that the voter supporting it would reasonably be expected to support the principle of the others, then there are in reality two or more amendments to be submitted, and the proposed amendment falls within the constitutional prohibition. Nor does the rule as stated unduly hamper the adoption of legitimate amendments to the Constitution. Such a document was presumably adopted deliberately, after careful preparation, as a harmonious and complete system of government. Changes suggested thereto should represent the free and mature judgment of the electors, so submitted that they cannot be constrained to adopt measures of which in reality they disapprove, in order to secure the enactment of others they earnestly desire." (l. c. 221.)

It was further said:

". . . It is evident that there are at least three distinct propositions contained therein, no two of which are necessarily required for a proper operation of the third. On their face they have no direct relation *to each other*. Their only connection is that they are all embraced in a broader general subject, to wit, that of taxation. It is clear that the provision in regard to the method in which copper mines should be taxed is in no way necessary to or concerned with the method of taxation of public utility corporations, and it is equally clear that both of those propositions could be inserted in the Constitution without the slightest need of adopting the one establishing the tax commission as a constitutional body which in effect would be independent of the regular executive and legislative branches of the state government in many particulars, and perhaps even of the judicial." (l. c. 221, 222.)

See, also, 94 A. L. R. 1510 Anno: Proposed Constitutional Amendment.

This court adopts the test of duplicity in a constitutional amendment as set forth in *Timme* and as adopted and clarified in *Kerby*. The pertinent rules having been stated, were there in reality two or more amendments submitted to the electors in each proposition? We shall discuss the propositions in their reverse order, and first turn to proposition 3.

As indicated, proposition 3 was submitted to the Legislature by the Citizens' Committee on Constitutional Revision in its comprehensive report to the Legislature and the governor shortly after the

1969 session convened. (Report of the Citizens' Committee on Constitutional Revision, 1969, pp. 2-10.) The Committee was composed of twelve citizens of the state who were appointed as provided in the Act. It was directed "to thoroughly examine and evaluate the constitution of the state of Kansas and to determine the provisions thereof which need revision," and was further directed to meet as often as necessary prior to the 1969 session, to fulfill its duties, and "report its findings and recommendations to the governor and said session of the legislature."

Except for a few minor changes, the Legislature submitted proposition 3 as proposed by the Citizens' Committee on Constitutional Revision. The title to House Concurrent Resolution No. 1026, submitting the proposition reads:

"A PROPOSITION to amend article 1 of the constitution of the state of Kansas, relating to the executive branch of state government, and repealing article 8 of the constitution of the state of Kansas."

In passing, it is noted the title of the resolution dealt with two articles of the Constitution—Article 1, relating to the executive department and Article 8, relating to the militia of the state. On its face the title indicates that two unrelated subjects are dealt with.

It is unnecessary to set forth proposition 3 in its entirety. It is sufficient to say the amendment contained eleven sections and repealed all but one of the existing sixteen sections of Article 1. Parts of those sections were transferred to new sections and new material was added to some of the eleven sections contained in the amendment, which were not renumbered. Likewise, the existing four sections of the militia article were repealed, and some parts of those sections were transferred to a new section of proposed Article 1. The following is a summation of the amendment's eleven sections.

Section 1 provided the tenure for the offices of the executive department, and limited its composition to the governor, lieutenant governor, secretary of state, and attorney general. The section eliminated the offices of auditor and treasurer from that department, which were provided for in existing Section 1, Article 1. (The office of superintendent of public instruction had been eliminated by the amendment of Article 6—education—in 1966.) The tenure of office of governor, lieutenant governor, secretary of state, and attorney general was extended from two years to four years, and commencing in the year 1974, and every four years thereafter,

elections for those offices are to be held in off-presidential years. Commencing in the year 1974, and thereafter, the candidates for governor and lieutenant governor will be nominated and elected jointly as a "team," so to speak, so that a single vote would be cast for a candidate for governor and for lieutenant governor running together. It was further provided that after 1974, no person may be elected to more than two successive terms as governor and lieutenant governor.

Section 2, providing for a Board of Election Canvassers, was repealed.

Sections 3, 4 and 5, as proposed by the Committee and submitted by the Legislature, incorporated and transferred with minor changes existing provisions of the Constitution which vested in the governor, as executive power, the responsibility to see that the laws are faithfully executed (Section 3), and the power to require in writing reports from officers of the executive department and of all public state institutions, which shall be transmitted by the governor to the Legislature. The latter clause was transferred from Section 16, which was repealed. The sections further empowered the governor to convene the Legislature in special session by proclamation, and a new clause was added authorizing the Legislature to convene into special session upon petition signed by at least two-thirds of the members elected to each house. The power to adjourn the Legislature in case of disagreement between the two houses as to time of adjournment, was transferred from Section 6.

Section 6, consisting of four subsections of new material, as proposed by the Committee, and submitted by the Legislature, authorized the governor to submit one or more executive reorganization orders to both houses of the Legislature within the first 30 calendar days of any regular session, to transfer, abolish or consolidate the whole or any part of any state agency within the executive branch, except constitutionally established departments. Executive reorganization orders as are so transmitted shall take effect, and have the force and effect of general law on July 1, following transmittal, unless within 60 days and before adjournment, either house of the Legislature adopts a resolution disapproving such orders. Any one of such reorganization orders which becomes effective, may be amended or repealed as statutes are amended or repealed.

Section 7 as proposed by the Committee, and submitted by the

Legislature, was the only section not changed. It vests ·the pardoning power in the governor under regulations and restrictions prescribed by law.

Section 8 as proposed by the Committee, and submitted by the Legislature, repealed existing Section 8 and transferred its provisions to Section 9. Sections 1, 2, 3 and 4 of Article 8, relating to the militia, were repealed, and parts of those sections were transferred to this section as new material. The section continued the power of the governor as Commander in Chief of the militia; to call out the militia to execute the law, to suppress insurrection or rebellion, and to repel invasion or to service in natural or other emergencies. A new clause was added authorizing the governor to proclaim martial law when public safety required it, but not for a period exceeding 20 days, except with the consent of the Legislature. The section removed the right of all citizens of any religious denomination whatever, who from scruples of conscience may be adverse to bearing arms, to be exempt from militia service.

Section 9 as proposed by the Committee, and submitted by the Legislature, incorporated the provisions of old Section 8, and continued in effect its former provisions with respect to the issuance of all commissions.

Section 10 prohibiting federal officers from being governor, was repealed.

Section 11 as proposed by the Committee, and submitted by the Legislature, contained a similar subject to that contained in existing Sections 11, 13 and 14. Section 11 provided that the lieutenant governor shall succeed the governor, but provided that succession of the lieutenant governor shall be as prescribed by law, rather than constitutional succession as prescribed in existing Section 13 which was repealed. Section 14 was likewise repealed, and its provisions concerning the appointment by the governor of members of the state executive department who become incapable of performing their duties, were transferred to Section 11.

Section 12 as proposed by the Committee, and submitted by the Legislature, repealed the provisions of existing Section 12 which provided that the lieutenant governor shall be president of the Senate and empowered to vote when the Senate is equally divided, and that the Senate shall choose a president pro tem to preside over that body in the lieutenant governor's absence, or when he succeeds to the office of governor. Section 12 as proposed provided

that the lieutenant governor shall assist the governor and exercise the powers and duties prescribed by law.

Section 15, relating to compensation of members of the executive department was amended in certain respects.

The court has no difficulty in ascertaining there are at least three specific changes of subject matter contained in proposition 3, neither of which is related to, dependent upon, or required for the operation of the other. There may be other changes of subject matter contained in the proposition, but the three hereafter detailed determine its violation of Section 1, Article 14, that when more than one amendment is submitted at the same time, they shall be so submitted as to enable the electors to vote on each amendment separately. In view of this conclusion, it is unnecessary to further explore the proposition and discuss other possible changes of subject matter.

Section 1 deals with tenure of office; composition of the executive department; provides that the governor and lieutenant governor shall run as a team, and prohibits those officers from holding office for more than two consecutive terms. With respect to that section, the court is of the opinion there are at least two distinct changes of subject matter proposed. The only connection between the two is that both are embraced in a broader general subject—the executive department— which was established by Article 1 in a single section. Commencing in 1974, the term of office of members of the executive department is extended from two years to four years. The extension of term of office relates to one subject, namely, tenure of office. That constitutes one specific change within the original lines of the Constitution. (*Keenan v. Price*, 68 Idaho 423, 195 P. 2d 662.) Moreover, the object and purpose of prohibiting any person to be elected to more than two successive terms as governor and lieutenant governor, likewise relates to tenure of those offices, since it is an express limitation on the right to exercise the constitutional and statutory powers conferred for not more than two successive terms.

The question was decided by the Idaho Supreme Court in *Keenan,* supra. A proposed constitutional amendment extended the term of office of members of the executive department of that state from two years to four years, and placed a limitation upon the governor succeeding himself. It was held the amendment embraced but one subject, and did not contain unrelated matters

which must be submitted to the electors separately. In the opinion
it was said:

The amendment . . . is on the same plan with modifications of certain
parts of the original set-up. The main or controlling change or question is the
four year term for executive state officials. The proviso that the governor shall
not succeed himself, except for being eligible to hold the office after a lapse
of one full term, is directly, properly and reasonably related to the matter of
terms and tenure of such officials, and is incidental and subordinate to the
main or controlling question . . ." (l. c. 453, 454.)

It was held that since only one section of the executive article was
amended containing matters relating to one subject only, there was
no violation of the Constitution in the submission of the amendment.
The court distinguished its holding from *McBee v. Brady*, 15
Idaho 761, 100 Pac. 97, upon the ground the proposed amendment
in *McBee* sought to amend four different sections of one article, one
section of another article, and repeal two sections of a third article.

The amendment involved in *Keenan*, supra, made no change in
the composition of officers of the executive department, but that
is not the case here. Section 1 eliminates the treasurer and auditor
as officers of the executive department. We are of the opinion the
composition of the executive department, although not directly
contradicting, is a subject wholly unrelated to, and in no manner
dependent upon, or connected with, the subject of tenure, and has
a different object and purpose. Tenure of executive officers is in no
manner related to what officers shall comprise the executive depart-
ment. Thus, there is no relation between the elimination of the
treasurer and auditor from the executive department, and a four-
year term for governor. Each of those matters constitutes a separate
subject and can stand alone without dependence on the other.
When the test of duplicity of amendments is applied to Section 1,
it may not be said that the change of one subject is so closely related
or dependent upon the other that if one would fall, the other would
necessarily fall also. On the contrary, one could be adopted with-
out the other, leaving the constitutional scheme symmetrical, har-
monious and independent. To deny an elector his right to vote on
each of the changes of subject matter separately is a denial of his
constitutional right to vote on each amendment separately. Had
an elector been given an opportunity, he might have expressed his
will in favor of extending the term of executive officers to four years
and prohibiting the governor from succeeding himself. On the other
hand, he might have opposed the extension of tenure and approved

the elimination of the auditor and treasurer as executive officers. In like manner, he might have approved one of those two subjects and disapproved all other changes in proposition 3, or vice versa. No matter how desirable one change might be, an elector was forced to vote for that which he may not favor in order to get the one change he might think right, or else deny the whole lump.

In addition to the foregoing, the court is of the opinion that the repeal of Article 8, relating to the militia, and transferring some of its powers to Section 8, Article 1—the executive department—involved at least one change of subject matter which was required to be submitted to the electors as a separate amendment. When the Constitution was adopted, the people considered those two obligations of government to be coordinate departments, but purposely made provision for their separate establishment. The manner in which the people shall exercise their right of bearing arms for the defense and security of the state was placed in Article 8 which authorized the organizing, equipping and discipline of the militia, to be composed of "all able-bodied male citizens between the ages of twenty-one and forty-five years." The purpose of Article 8 has been stated by this court in *Salina v. Blaksley,* 72 Kan. 230, 83 Pac. 619. The militia is essentially the people's army and persons who from scruples of conscience may be adverse to bearing arms, were exempt from the militia. The clause relating to conscientious objection was omitted when those powers were transferred to Section 8, Article 1. Moreover, that section contains new material which limits the governor in proclaiming martial law for longer than twenty days without the approval of majority of the members of the Legislature in joint session.

It is clear to us that the changes proposed by transferring the powers relating to the militia to Section 8, Article 1, and repealing Article 8, is a subject separate and distinct, and wholly unrelated to, or dependent upon, the question whether the officers of the executive department shall have a four-year term, or whether the governor has the power to issue executive reorganization orders to abolish, alter or transfer any state department. There is no similarity of subject matter, and one change is not dependent upon the other. Each subject may stand alone, and the electors might be justly for one and against the other.

Looking at proposition 3 as reasonable men, we are of the opinion the proposed amendment is a most glaring violation of the constitutional provision involved, in that it submits at least three

separate propositions upon which the electors might, and many doubtless would, have widely differing opinions, and in such a manner that they are compelled either to reject all three on account of one which may be considered vicious, or else accept two propositions they disapprove, to secure the adoption of one which meets their favor. (*Kerby v. Luhrs,* supra; *Lee v. State,* 13 Utah 2d 15, 367 P. 2d 861.) The proposed amendment violates both the spirit and the letter of Section 1, Article 14, of the Constitution.

Turning to proposition 2, the title to House Concurrent Resolution No. 1033 submitting the proposition, reads:

"A PROPOSITION to amend article 14 of the constitution of the state of Kansas, relating to constitutional amendment and revision."

It is unnecessary to set forth proposition 2 in its entirety. The proposition amended Sections 1 and 2 of Article 14. Section 1 relates to amending the Constitution by the legislative method, and Section 2 relates to changes made in revising or amending the Constitution by the convention method.

The plaintiff contends the following changes made in Section 1, *i. e.,* submitting five *amendments* at the same election instead of three *propositions* as provided in original Section 1; changing the publication notice of amendments from three months to five weeks; submitting amendments by title generally descriptive of the content thereof; voting on amendments at a special election called for the purpose of submitting constitutional amendments; revising an entire article of the Constitution by one amendment, except the article on general provisions, and in revising any article, the article may be renumbered and all or parts of other articles may be amended, or amended and transferred to the article being revised, constitute separate propositions which must be submitted to the electors as separate amendments.

The plaintiff further contends that Section 2, which relates to calling a constitutional convention to "revise, amend or change" the Constitution, is a change of subject matter and must be submitted separately to the electors. In support of his contention, he argues that what the Legislature submitted in proposition 3 is exactly what the electors were asked to approve in Sections 1 and 2 of proposition 2, and that if proposition 2 is approved by this court, there would never be need to call a constitutional convention since the Legislature would have the right to submit five separate amendments at the same time to revise or change five entire articles of the

Constitution. He further argues that the approval of proposition 2 by this court gives the Legislature the right to do by amendment what it is now required to do by constitutional convention, and the subject of constitutional convention is a separate and distinct change not related to, or dependent upon, any other change contained in proposition 2.

The plaintiff's contentions are not well taken. It is clear the whole scope and purpose of the matter submitted to the electors in proposition 2 was a change in the manner of amending and revising the Constitution. That was the main or controlling change submitted. While, as previously indicated, there is a difference between the legislative method and the convention method of amending and revising the Constitution, there is nothing incongruous or essentially unrelated in submitting those matters in one amendment, since the general subject involved relates to the manner of changing the Constitution. We do not state that the Legislature, had it seen fit, might not have submitted, as separate amendments, the question of the manner of amending the Constitution and of calling a constitutional convention, but we think that under the Constitution and within the limits stated in *Timme,* supra, as clarified and adopted in *Kerby,* supra, the question submitted was a single amendment and that separate propositions were unnecessary to accomplish a single purpose. Conceding the fact that both sections of the amendment consisted of considerable detail, certainly no good could result from a separate submission, which would be equally as well and better accomplished by submitting the matter together as one amendment. The question submitted in proposition 2 covered matters necessary to be dealt with in some manner to insure that the Constitution, as amended, would constitute a consistent and workable whole on the general topic embraced in Article 14 which was amended, and, logically speaking, the methods of amending and revising the Constitution should stand or fall as a whole.

The plaintiff lastly points out that three propositions to amend the Constitution were submitted by the Legislature to the electors at the general election in November, 1970. He contends that if either proposition 2 or 3 is found to contain two or more amendments, then four or more amendments were submitted to the electors, when the Constitution and this court has said that "under no circumstances may more than three proposals for constitutional amendments be submitted together (*State, ex rel., v. Sessions,* supra), and argues

that all amendments submitted by the 1970 Legislature, are in violation of Section 1, Article 14, are invalid, and must be stricken down. The point is not well taken. The mandatory prohibition is directed at "propositions to amend" of which not more than three may be submitted together. The court is of the opinion that Section 1, Article 14, makes a distinction between the word "amendment" and the word "proposition," that is, the constitutional prohibition is against submitting more than three proposals to amend the Constitution at the same time, however, if one of such propositions is found to contain more than one amendment, the other proposals to amend do not violate the constitutional prohibition. Even though the court has concluded that proposition 3 contains at least three *amendments* which should have been submitted to the electors separately, there were not more than three propositions submitted to the electors at the general election in 1970. The fact that proposition 3 has been determined to be invalid does not affect the validity of the submission of proposition 2.

For the reasons heretofore set forth, the judgment of the district court is affirmed in part and reversed in part, and it is directed to enter judgment in accordance with the views expressed in this opinion.

SCHROEDER and FONTRON, JJ., concur in the result.

FATZER, J., concurring and dissenting: It fell to my lot to present this case for the court's decision and to write the majority opinion. However, there are times when a judge cannot agree with the court's opinion, and I find myself in that position in the instant case.

With respect to proposition 3, and considering the case from the point of view that it is an "amendment" to the Constitution, I concur in the court's decision that the proposition is a palpable violation of the constitutional principle involved. However, I wish to state and hereafter note briefly at least three other separate amendments contained therein. Moreover, and having an abiding conviction that proposition 2 is in clear violation of that same constitutional principle, I have no alternative except to dissent to the court's decision on that point.

Before discussing other separate amendments in proposition 3, reference is made to the report of the Citizens' Committee on

Constitutional Revision to the governor and Legislature in 1969. The format of the report contained a summary of what the Committee entitled "significant changes" in each of the separate propositions submitted to *revise* the Constitution, including propositions 2 and 3, which preceded the text of each proposed amendment. The text of each article or proposition was then presented in the form of a concurrent resolution of the Legislature. Unchanged material in the text appeared in Roman type, new material appeared in italic type, and recommended deletions were printed in strike-type. The report stated the Committee felt "the format of using *specific and clearly identified changes* in the constitution is the best means of setting forth its recommendations." (Introduction, p. VII.) (Emphasis supplied.)

With respect to proposition 3, the significant changes listed by the Committee were stated as follows:

"Article 1.—Executive

"1. The elective constitutional executive offices are limited to the governor, lieutenant governor and attorney general.

"2. The decision as to whether the offices of state auditor and state treasurer shall continue to exist, and if they do, then whether those two offices shall be elective or appointive is placed within the discretion of the legislature.

"3. The secretary of state may be an elective or appointive office as determined by the legislature, but is a required constitutional office.

"4. Elections for governor, lieutenant governor and attorney general are to be held in off-presidential election years commencing in 1974, and their terms are to be four years.

"5. Commencing in 1974, the governor and lieutenant governor are to be nominated and elected as a team.

"6. Deletes the requirements that the governor's message to the legislature must be delivered at the commencement of the legislative session.

"7. Permits the governor to submit an executive order to the legislature reorganizing any agencies under the executive department. Constitutionally delegated functions are exempt from such orders. Such an order is to take effect and to have the force and effect of law unless it is disapproved by one of the houses of the legislature within a prescribed time.

"8. Authorizes the governor to proclaim martial law when public safety requires it but for not longer than twenty days at a time unless approved by the legislature.

"9. Makes the succession to the offices of governor and lieutenant governor, in the event of vacancies in both offices, a subject to be regulated by statute rather than by the constitution.

"10. Directs the governor to appoint a person to assume the powers and duties of the attorney general if the attorney general is disabled.

"11. Provides that the procedure for determining the disability of the governor, lieutenant governor and attorney general shall be as provided by law.

"12. Removes the lieutenant governor as presiding officer of the senate, and provides that he shall assist the governor and have such other duties and powers as are prescribed by law."

It thus appears the Legislature, in providing for the submission of the proposed changes to the Constitution, recognized and considered that the matters covered in propositions 2 and 3 involved the several specific and clearly identified independent changes stated by the Committee, and that it adopted those significant changes as a part of the submission of each of those propositions. Yet, not withstanding the fact that the particular matters covered in each proposition involved distinct, specific and unrelated changes of subject matter, the Legislature made no provision and gave the electors no opportunity to vote upon each of those amendments separately. The entire matter proposed in each proposition was submitted to the electors in a lump, and they were compelled to accept or reject all of the proposed and stated changes. They had no choice. If an elector had an opportunity, he might have desired to express his will in favor of extending the tenure of executive officers and prohibiting the governor and lieutenant governor from holding more than two successive terms. Yet he might not have approved that proposed change, and been in favor of permitting the lieutenant governor and the governor to run as a team. On the other hand, he might not approve the matter of the governor issuing reorganization orders, but favor the repeal of Article 8 and the changes made with respect to the militia. In like manner, he may have approved any one of the specific changes enumerated by the Committee, and disapproved all others. Under the method adopted by the Legislature, no choice was given, and the elector was forced to approve or disapprove all of such matters as a single proposition.

From this analysis, it is apparent the Legislature incorporated in a single amendment several distinct, unrelated, and independent propositions, any one of which could have been adopted by the electors, and the Constitution's efficiency or completeness would not have been modified or qualified in any way by a failure to adopt any one or more of the other questions. While the Constitution places no limitation upon the Legislature as to form of proposing amendments, it expressly fixes and defines the manner of submitting the same for adoption by the electors, and requires that the submission be in such form that the electors may vote on each

amendment separately. (*Kerby v. Luhrs*, 44 Ariz. 208, 36 P. 2d 549, 94 A. L. R. 1502.)

Turning to other specific amendments contained in proposition 3, I first refer to the repeal of Section 12, Article 1, eliminating the lieutenant governor as president of the Senate. Our Constitution was so framed as to vest in the Legislature all legislative powers (not otherwise limited by the Constitution), to vest in the governor the executive power, and to vest in the supreme court and other courts, the judicial power. From this division on principle, the reasonable construction of the Constitution is that the three departments should be kept separate in all cases in which they were *not expressly blended,* and that the Constitution should be interpreted to blend them no more than it affirmatively requires. See *State, ex rel., v. State Office Building Commission,* 185 Kan. 563, 345 P. 2d 674.

There are several expressly blended executive and legislative powers in the Constitution, one of which is the power conferred upon the lieutenant governor. By Section 1, Article 1, the lieutenant governor is a member of the executive department. Under existing Section 12, Article 1, the lieutenant governor shall be president of the Senate, and shall vote only on concurrent resolutions when the Senate is equally divided. (*Coleman v. Miller,* 146 Kan. 390, 71 P. 2d 518, affirmed 307 U. S. 433, 83 L. Ed. 1385, 59 S. Ct. 972.) The section further declares the Senate shall choose a president pro tem, to preside in case of the lieutenant governor's absence or impeachment, or when he shall hold the office of governor.

As proposed by the Citizens' Committee on Constitutional Revision, and submitted by the Legislature, Section 12, Article 1, was repealed. An amendment containing new material was added which provided that "[t]he lieutenant governor shall assist the governor and have such other powers and duties as are prescribed by law."

The great importance of the lieutenant governor being the president of the Senate, and his right to vote on concurrent resolutions, is discussed at length in 'Coleman, supra. The point at issue was the approval by the Senate of a resolution to ratify an amendment to the Constitution of the United States. This court quoted at length and with approval from Jameson on Constitutional Conventions, 4th Ed., and concluded the Constitution authorized the lieutenant governor to vote on the resolution when the members of the Senate were equally divided. The supreme court of the United States

affirmed. While the blended executive and legislative powers of the lieutenant governor were not specifically discussed, it is apparent that the right of the lieutenant governor to vote on limited measures as president of the Senate is the exercise of an important constitutional power, particularly on a subject of such great magnitude as to bind the people of this state in delegating their power of sovereignty to the government of the United States. The elimination of right of the lieutenant governor to exercise the blended constitutional powers of his office is, then, a drastic revolutionary alteration of the existing constitutional requirement on the subject.

This great change, then, in abolishing the right of the lieutenant governor to preside as president of the Senate, and to exercise the blended powers conferred on that office, has no bearing in any respect on the purpose of proposition 3, to change the tenure and composition of the executive department, nor is it related to, or dependent upon organizing and equipping the militia, or connected in any manner with reorganization orders issued by the governor, nor does it tend to effect or carry out that purpose, or have any relation to other subjects contained in the proposal. It must have some different object or purpose, and thus it fails to satisfy the test laid down in *The State ex rel. Hudd vs. Timme, Secretary of State,* 54 Wis. 318, 11 N. W. 785, as clarified and adopted in *Kerby v. Luhrs,* supra. A very similar point was decided by the Wisconsin Supreme Court in *State ex rel. Thompson v. Zimmerman,* 264 Wis-644, 60 N. W. 2d 416, which followed and applied the *Timme* case, and held in effect that where a constitutional principle had been decided by the court, a separate submission was required of the amendment seeking change of the constitutional principle announced.

The office of lieutenant governor is an integral part of the expressly blended powers of the Constitution, and I conclude that a separate submission was required of the amendment abolishing the office of president of the Senate, and repealing the blended constitutional powers of the lieutenant governor.

I next refer to the Committees' specific change 5, stated above. In my opinion the elimination of the right of the people of the state to vote separately for a candidate for the office of lieutenant governor is a subject wholly unrelated to, or dependent upon, either tenure or composition of members of the executive department, or any other subject contained in proposition 3, and requires a separate submission of an amendment eliminating this right of franchise.

Counsel for the parties cite no authority on the point, and my research discloses none. But, based upon logic and reason, it seems inconceivable that proposition 3 can be saved upon this point by saying that it relates to the executive department. If that argument is correct, then the mere fact that amendments—no matter how independent each from the other—relating to the Legislature, the judiciary, or as here, the executive, will permit all to be submitted as one. Whether amendments are one or many must be resolved by their inherent nature—by a consideration whether they are separate and independent subjects each from the other so that each may stand alone without the other, or all fall as a whole, leaving the constitutional scheme symmetrical, harmonious, and independent on that subject. (*Kerby v. Luhrs*, supra.)

The requirement that the governor and lieutenant governor be nominated and elected as a team, is a radical departure from the original scheme of the Constitution, and, as indicated, the proposal does not relate to tenure of the office of lieutenant governor, or to the composition of the executive department. What is proposed is to eliminate the right of the people to vote for the lieutenant governor separately, and require the electors to vote for the governor and lieutenant governor running together. This is fundamental change in our organic law, and is a separate subject unrelated to, or dependent upon, other changes of subject matter contained in the amendment, and requires a separate submission of the question.

Lastly, I refer to the Committees' specific change 7, stated above, which appears as Section 6 of the amendment and contains four subsections of new material. This section is entitled "[r]eorganization of state agencies of executive branch," and provides in substance the governor may submit executive reorganization orders to the Legislature to transfer, abolish, or consolidate the whole or any part of any state agency within the executive department, except constitutionally established departments. These orders are given the force and effect of law, unless disapproved by at least one branch of the Legislature within 60 days after they are submitted, and before adjournment of the session to which they are submitted. Once in effect, such orders may be amended only by statute, although the Legislature is not permitted to amend such orders when submitted by the governor in the first instance.

It is well settled constitutional law of this state that the legislative power is vested in the House of Representatives and Senate (Sec. 1,

Art. 2), and that the executive power is vested in the governor to faithfully execute the law enacted by the Legislature. As stated in the court's opinion, an "amendment" implies such addition to or change within the lines of the original instrument as will effect an improvement, or better carry out the purpose for which it was framed. (*Livermore v. Waite,* 102 Cal. 113, 36 Pac. 424, 25 L. R. A. 312.)

On its face, the subject of reorganization of state agencies of executive branch, has no relation to tenure, or composition of the executive department as provided in Section 1, or with Section 8 relating to the "[m]ilitia and martial law" which repealed Sections 1, 2, 3 and 4 of Article 8 of the original Constitution, or with respect to the repeal of the office of president of the Senate established by Section 12, Article 1. The power to establish a state agency to carry out the purposes and objects of state government, or to transfer the powers of such an agency to another agency, or to abolish a state agency, is a legislative power, and the many decisions of this court have so held. This is such a well-established fact of state government that the citation of authority is unnecessary to support the statement. Likewise, it is a well-established constitutional principle that the power to approve or veto legislation is vested in the governor. (Sec. 14, Art 2.) However, the purport of Section 6 appears to reverse this governmental policy by authorizing the governor to exercise legislative power to transfer, abolish or consolidate state agencies of the executive branch, and to place the power of veto in the Legislature with respect to such reorganization orders issued by the governor, which have the force and effect of law. unless at least one branch of the Legislature *disapproves such orders.*

This is indeed a radical departure from the original lines of the Constitution and on its face constitutes a *revision* rather than an amendment to the Constitution. Again, counsel for the parties cite no authority on the point, and my research discloses none. While it may be said that the provisions of Section 6 may be germane to the executive department, they are in no sense germane, nor within the lines of the existing Constitution. On the contrary, they wipe out a fundamental principle of government in the existing frame of the Constitution, and substitute therefor another wholly different in several respects.

Considering the foregoing, it is apparent that Section 6 has no relation to, or dependency upon, the question whether the governor

shall have a four-year term, or is elected as a team with the lieutenant governor, or is limited to two consecutive terms of office, or to any other subject contained in proposition 3. Obviously, Section 6 can stand alone and has no connection with other specific changes recommended by the Committee, and that an elector might favor such a change in constitutional government, and be against the others heretofore stated and those specifically enumerated in the court's opinion.

Turning to proposition 2, it is my opinion the proposed amendment was submitted to the electors in clear violation of Section 1, Article 14. The proposition contains more than one subject, having at least two distinct and separate purposes, not related to, or dependent upon, or connected with, each other. In addition, it changes or alters a constitutional principle decided by this court (*State, ex rel., v. Shanahan,* 183 Kan. 464, 327 P. 2d 1042), which requires a separate submission of an amendment seeking change of the constitutional principle announced. (*State ex rel. Thompson v. Zimmerman,* supra.)

Before discussing separate amendments in the proposition, reference is again made to the report of the Citizens' Committee on Constitutional Revision in 1969. As indicated, the Committee submitted, together with the text of proposition 2, its list of "significant changes" made in the proposed amendment. The changes listed by the Committee follow:

"Article 14.—CONSTITUTIONAL AMENDMENT AND REVISION

"1. Allow submission of amendments to the voters at special elections called by the legislature for that purpose.

"2. Allow an amendment to be submitted to the voters by a descriptive title, or by stating the amendment in full as is presently required.

"3. Increase from three to five the number of amendments which may be submitted to the voters at any one election.

"4. Clarify to provide that revision of an entire article, or combining all or parts of two articles, except the article on general provisions, may be submitted to the voters as one proposition to amend, but each proposition must relate to a common subject.

"5. Amplify provision for consideration of constitutional revision or amendment by convention. Provide for limited convention. Provide procedure for submitting to the voters the question of whether or not a convention shall be held, provide for election of delegates, the powers of a convention, and for submission of the proposals of a convention to the electors for adoption or rejection."

In providing for the submission of the proposed amendment, the

Legislature recognized and considered that matters covered in proposition 2 involved the several specific, and clearly identified independent changes stated by the Committee, and it adopted those changes as a part of the submission of the proposition.

As indicated in the court's opinion, Article 14 provides two methods by which changes may be effected in the Constitution. Section 1, through the adoption by the people of specific amendments which have previously been submitted by two-thirds of the members of each branch of the Legislature, and the other, Section 2, by a convention of delegates chosen by the people for the express purpose of revision of the entire instrument, or one or more articles thereof. The first is referred to as the legislative method, and the second as the convention method.

Where the Constitution prescribes a method of procedure, that method is the exclusive measure of power, and is as mandatory as a general prohibition. (*State, ex rel., v. Sessions,* 87 Kan. 497, 124 Pac. 403.) An "amendment" to the Constitution implies an addition to or change within the lines of the original instrument as will effect an improvement or better carry out the purpose for which it was framed. The test for determining whether a proposition contains more than one amendment is stated in *Timme* and clarified and adopted in *Kerby.* It is unnecessary to restate the test. Changes few in number, and less sweeping, are brought about by the legislative method, and it was not thought wise to permit more than three separate amendments to be submitted at one time. (*State, ex rel., v. Sessions,* supra.) On the other hand, a revision of the Constitution, or one or more of its articles, is required to be accomplished by constitutional convention. Jameson on Constitutional Amendments, 4th Ed. states, "[t]hat, whenever a Constitution needs a general revision, a Convention is indispensably necessary . . ." (§ 219. 2. p. 211.)

In *Kelly v. Laing,* 259 Mich. 212, 242 N. W. 891, the supreme court defined the distinction between revision and amendment, and stated:

"'Revision' and 'amendment' have the common characteristics of working changes in the charter and are sometimes used inexactly, but there is an essential difference between them. Revision implies a re-examination of the whole law and a redraft without obligation to maintain the form, scheme, or structure of the old. As applied to fundamental law, such as a constitution or charter, it suggests a convention to examine the whole subject and to prepare and submit a new instrument, whether the desired changes from the

old be few or many. Amendment implies continuance of the general plan and purport of the law, with corrections to better accomplish its purpose. Basically, revision suggests fundamental change, while amendment is a correction of detail." (1. c. 217.)

In my opinion, there is a clear distinction between the methods prescribed in Section 1 and in Section 2 for changing the Constitution. Those two sections authorize different procedures for very different purposes. The case of *McFadden v. Jordan*, 32 Cal. 2d 330, 196 P. 2d 787, is clearly in point. There, the supreme court of California held that a proposed amendment was in fact a revision of the Constitution. In stating the difference between the procedures for an amendment, and for revision of the Constitution, it was said:

". . . We cannot accept such an arbitrary and strained minimization of difference between *amend* and *revise*. The differentiation required is not merely between two words; more accurately it is between two procedures and between their respective fields of application. Each procedure, if we follow elementary principles of statutory construction, must be understood to have a substantial field of application, not to be . . . a mere alternative procedure in the same field. Each of the two words, then, must be understood to denote, respectively, not only a procedure but also a field of application appropriate to its procedure. The people of this state have spoken; *they made it clear when they adopted article XVIII* [very similar to Article 14] *and made amendment relatively simple but provided the formidable bulwark of constitutional convention as a protection against improvident or hasty (or any other) revision, that they understood that there was a real difference between amendment and revision.* . . . Intervenors' contention—that any change less than a total one is but amendatory—would reduce to the rubble of absurdity the bulwark so carefully erected and preserved. Each situation involving the question of amendment, as contrasted with revision, of the Constitution must, we think, be resolved upon its own facts . . ." (1. c. 347, 348.) (Emphasis supplied.)

See, also, *Ellingham v. Dye*, 178 Ind. 336, 99 N. E. 1.

Sections 1 and 2 of Article 14 authorize the doing of a *different* thing in a *different* way. There is no room for doubt that a distinction was intended between the things authorized to be done by the two sections. It seems impossible to escape the conclusion that the framers of the Constitution did not suppose they were providing for doing the same thing in both methods authorized by them. There is no relation between the two things authorized to be done. The legislative method is confined to a narrow and defined purpose, and that by convention to a broader and more general and undefined purpose, embracing within its scope the former, and possibly much more. (Jameson on Constitutional Conventions, 4th

Ed. § 574, c. p. 612.) In sum, proposition 2 contains at least two subjects relating to different procedures, which have different objects and purposes, not dependent upon, or related to the other, and which require their separate submission to the electors. The amendment and the revision of the Constitution are indeed separate subjects.

In addition, Section 1 of proposition 2, authorizes the Legislature to submit a proposed amendment by a title generally descriptive of the contents of the proposal. In *State, ex. rel., v. Shanahan,* supra, this court held that Section 1, Article 14, expressly requires a proposed amendment be printed in full on the ballot, to permit the electors to advise themselves of the change proposed in the Constitution. Such a constitutional deviation from that required, to that proposed, constitutes a separate subject which is required to be submitted to the electors, as a separate proposal to amend. (*State, ex rel., Thompson v. Zimmerman,* supra.)

The Legislature has seen to it that, by the submission of proposition 2 and its adoption by the people, a constitutional convention will never again be necessary or open to argument in Kansas. Two-thirds of the members of each house concurring, the Legislature may propose and submit at the same election, the *revision* of at least five separate articles of the Constitution in which all or parts of other articles may be amended, or amended and transferred to the article being revised, and thus, indirectly propose a new Constitution—all under the artifice—I do not say subterfuge—of an amendment to the Constitution. In short, the Legislature may now initiate and control the constitutional revision process. Such a fundamental check as the formidable bulwark of a constitutional convention to protect against an improvident and hasty *revision* of the Constitution is being set aside in the name of expediency and convenience, and by means of a tenuous interpretation to which I cannot agree.

Before concluding, I feel compelled to refer to a more basic reason, not heretofore touched upon, why propositions 2 and 3 were submitted in violation of Article 14. Those propositions, as well as others, were conceived as the result of a legislative plan to revise the Constitution without the calling of a constitutional convention as required by Article 14.

The novel device selected by the Legislature in establishing the Citizens' Committee on *Constitutional Revision* (Ch. 265, L. 1968),

has resulted in proposing a *massive* revision of the Kansas Constitution in violation of the mandatory provisions of Article 14. The Constitution may be revised only by a convention of the people, called for that purpose by the concurrence of two-thirds of the members of each house of the Legislature, and the question of calling such a convention has been submitted to the electors, and their vote has been in favor of a convention. Thereafter, and at the next session, the Legislature shall provide for calling the same. (Sec. 2, Art. 14.) The authorities on the question are unanimous, and a few are *Ellingham v. Dye,* supra; *Holmes v. Appling,* 237 Or. 546, 392 P. 2d 636, and *McFadden v. Jordan,* supra.

In *Ellingham* the Legislature adopted a new Constitution without calling a constitutional convention, and proposed to submit it to the electors as an amendment to the Constitution. In refusing to approve the submission, the Indiana Supreme Court stated what I believe to be the fundamental principle of constitutional revision:

". . . [W]here the means by which a power granted shall be exercised are specified, no other or different means for the exercise of the power can be implied, even though considered more convenient or effective than the means given in the constitution . . ." (l. c. 379.)

The court summed up its decision by saying:

". . . [T]he act of 1911, *supra,* is invalid for want of power in the General Assembly to draft an entire Constitution, and forthwith submit it to the people under its general legislative authority if the instrument be conceded to be a new Constitution, and not merely amendments; *and that if it be considered as merely a series of amendments, it is a palpable evasion and disregard of the requirements and checks of article* 16 [similar to Art. 14], *and is, for that reason, void* . . ." (l. c. 385.) (Emphasis supplied.)

The Citizens' Committee on Constitutional Revision was directed by the Legislature to thoroughly examine the Constitution and determine the provisions "which need *revision*" (emphasis supplied), and to report its recommendations to the governor and the Legislature at the 1969 Session. The Committee, composed of twelve wise and able men and women of the state, held twenty meetings at which a large number of interested citizens and representatives of various groups appeared to contribute their opinions and experience. In its report to the Legislature, the Committee stated it believed that "*revision* of the Kansas constitution should have high priority" (emphasis supplied), and to carry out that belief, it submitted the text of separate propositions in the form of concurrent resolutions of the Legislature. The Committee's report

was comprehensive, and contained the text of extensive changes in fourteen of the existing fifteen articles of the Constitution. No change was recommended with respect to the Bill of Rights. Three existing articles were recommended to be repealed (Article 5—Suffrage; Article 8—Militia; Article 13—Banks and Currency), and some of their sections were recommended to be amended and transferred to other proposed amended articles. A new Article 5—Intergovernmental Relations—consisting of three sections, was proposed. No recommendation was made concerning existing Article 11—Finances and Taxation—since the Committee was advised that two other committees, one created by the Legislature and one appointed by the governor—were studying possible revision of that article, and the Committee "deferred in making any recommendations for *revision.*" (Emphasis supplied.) In sum, the Committee's report was that the Constitution of Kansas contain twelve proposed articles, instead of the existing fifteen articles, and that Article 11 continue unchanged. Its report further stated that certain portions of the Constitution "seemed to be in greater need of *revision*" (emphasis supplied); that a priority system should be established to accelerate the "program," and "that the articles needing earliest attention are Article 14—Constitutional Amendments and Revision; Article 1—Executive; Article 2—Legislative; Article 3—Judicial; and Article 9—City, County and Township Organization."

The Legislature followed the Committee's recommended priority "program," and submitted propositions 2 and 3 as proposed constitutional amendments to the electors for their approval or rejection. If the purpose of the Legislature in establishing the Committee was to secure the adoption by the people of specific amendments, no constitutional objection would lie against such action. But, on the other hand, if its purpose was, or if the result of the Committee's recommendations would be to submit to the people through a series of amendments so that a complete revision of the Constitution resulted, the action would be objectionable and in violation of Article 14. In the latter case, a general revision of the Constitution would result from the action of the Legislature, and from a body of its creation, and not as contemplated by the Constitution itself. That would be unconstitutional action. (Jameson on Constitutional Conventions, 4th Ed., § 574 *d*, p. 615.)

Considering the recommendations of the Committee to the Legislature with objective and mature judgment, I can reach no con-

clusion other than that if its recommendations do not amount to a massive revision of the Constitution, it is hard to say what would. It is obvious that the purpose of the legislative act in establishing the Committee and the result of its report is to submit to the people a complete revision of the Constitution through the artifice of amendments. (Jameson on Constitutional Conventions, § 546 c, p. 573). As concluded by the Supreme Court of Indiana, if the Committee's proposed resolutions be considered as merely a series of amendments, it is a palpable evasion and disregard of the requirements and checks of Article 14. Propositions 2 and 3 were a part of the total plan to revise the Constitution in a manner not authorized by Article 14, and were void when submitted by the Legislature. (*Ellingham v. Dye,* supra.)

In conclusion, my colleagues and I, in common with other officials of the state, have taken upon ourselves the solemn obligation to support the Constitution of the United States, and the Constitution of the state of Kansas, and to discharge the duties of our offices according to the best of our ability. That such duty has been discharged by them I readily concede, as has been done in my own case, although we differ in our judgment on the application of the constitutional principles involved. If we would not observe our obligation, we would not only violate our oaths, but we would be unfaithful to the trust reposed in us by the people of Kansas. Our first duty is to them, and we shall perform it according to the best of our understanding, without regard to what the effect may be upon us individually—either present or future. If courts should ever become so weak and vacillating as to base their decisions upon public clamor to avoid criticism, or seek to meet with public approval, instead of being activated by sincere purpose to do justice, then the people of this state are denied their constitutional right to have their causes determined by an impartial and disinterested tribunal. The basic foundation of the republican form of government of the state of Kansas is the Constitution. If the Constitution of Kansas is undermined, or its provisions are disregarded by those in authority, or by any citizen of the state, the structure will fall, and that instrument will no longer be the vehicle which reconciles for the people of our state, "the requisite for progress with the requisite for safety and order." The Constitution is the work of the people—it declares their will—and those who would disobey its provisions, instead of disobeying the people, are in fact disregarding and defying their will.

Courts should not bend the Constitution to suit the law of the hour; neither should they fail to look beyond the end result sought to be accomplished by the thing proposed. In my judgment, the means selected by the Legislature to change the Constitution is nothing less than a massive revision of the entire Constitution through the creation of a Citizens' Committee on Constitutional Revision, and directing that committee to propose *revision* of the Constitution through the artifice of so-called "amendments." For the Legislature to submit such propositions to the electors without substantial change, which it did in 1970, instead of calling a constitutional convention as authorized by Section 2, Article 14, permitting direct participation by the people in the proposed revision—not amendment—of the Constitution, "lacks the sanction of law [and] is a disregard of constitutional methods and limitations," so aptly stated by Mr. Justice Brewer in the *Prohibitory Amendment Cases,* supra. (p. *711.) If the Constitution needs revision in whole or in part, then it should be revised in accordance with the convention method provided in Section 2, Article 14.

I would reverse the judgment of the district court and direct it to enter judgment for the plaintiff on propositions 2 and 3.

FROMME, J., joins in the foregoing dissent as to proposition 2.